# GOODYEAR ATOMIC CORP. *v.* MILLER ET AL.

No. 86–1172.   Argued January 19, 1988—Decided May 23, 1988

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, BLACKMUN, STEVENS, and SCALIA, JJ., joined. WHITE, J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post*, p. 186. KENNEDY, J., took no part in the consideration or decision of the case.

*Robert E. Tait* argued the cause and filed briefs for appellant.

*Thomas W. Merrill* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Lauber, Richard G. Taranto,* and *Leonard Schaitman.*

*Stewart R. Jaffy* argued the cause for appellees. With him on the brief for appellee Miller were *Michael H. Gottesman, David M. Silberman,* and *Laurence Gold. Anthony J. Celebrezze, Jr.,* Attorney General of Ohio, and *Helen M.*

*Ninos, Dennis L. Hufstader,* and *Jeffery W. Clark,* Assistant Attorneys General, filed a brief for appellee Industrial Commission of Ohio.*

JUSTICE MARSHALL delivered the opinion of the Court.

The issue presented in this case is whether the Supremacy Clause bars the State of Ohio from subjecting a private contractor operating a federally owned nuclear production facility to a state-law workers' compensation provision that provides an increased award for injuries resulting from an employer's violation of a state safety regulation.

I

This case arises from an accident involving a worker at the Portsmouth Gaseous Diffusion Plant, a nuclear production facility located near Piketon, Ohio. The plant is owned by the United States, but at all times relevant to this action it was operated by a private company, appellant Goodyear Atomic Corporation, under contract with the Department of Energy (DOE). On July 30, 1980, appellee Esto Miller, a maintenance mechanic employed by Goodyear at the Portsmouth plant, fell from a scaffold while performing routine maintenance work and fractured his left ankle. His fall apparently was caused when his glove caught on a bolt protruding from the guardrail of the scaffolding. Miller applied to the Ohio Industrial Commission for an award under the State's workers' compensation program, for which Goodyear pays premiums to cover its Portsmouth employees. He received about $9,000 in workers' compensation.

After returning to work, Miller filed an application for an additional award on the ground that his injury had resulted from Goodyear's violation of a state safety requirement.

---

*Briefs of *amici curiae* urging affirmance were filed for the National Conference of State Legislatures et al. by *Benna Ruth Solomon, Joyce Holmes Benjamin,* and *Beate Bloch;* and for the Oil, Chemical, and Atomic Workers International Union by *Donald J. Mares* and *John W. McKendree.*

Miller alleged that his fall was caused by Goodyear's failure to comply with Ohio Admin. Code § 4121:1–5–03(D)(2) (1987), which provides that "[e]xposed surfaces [on scaffolds] shall be free from sharp edges, burrs or other projecting parts." The Ohio Constitution provides that when an injury is caused by an employer's failure to comply with a specific state safety requirement, the Industrial Commission shall provide an additional award of 15% to 50% of the benefits already received. Ohio Const., Art. II, § 35. The state insurance fund recoups these additional payments by increasing the premium paid by the employer. *Ibid.*

The Ohio Industrial Commission denied Miller's claim for a supplemental award. The Commission held that "the [Ohio] Codes of Specific Safety Requirements . . . may not be applied to the Portsmouth Gaseous Diffusion Plant under the doctrine of federal preemption." Claim No. 80–19975 (Mar. 8, 1983), App. 18. Miller filed a mandamus action in the Ohio Court of Appeals, seeking an order directing the Industrial Commission to consider his application. The court held that "[u]ntil it is clear that the federal government has preempted the field of safety regulation for safety hazards unrelated to radiation, . . . state specific safety regulations that give rise to an award for violation thereof are equally applicable to an entity that contracts with the federal government for operation of a nuclear power facility owned exclusively by the federal government." No. 84AP–208 (July 25, 1985), App. 17. The court therefore ordered the Industrial Commission to consider Miller's claim that he was due an additional award because his injury was caused by a violation of a state safety regulation.

A divided Ohio Supreme Court affirmed the decision of the Court of Appeals. *State ex rel. Miller* v. *Ohio Industrial Comm'n*, 26 Ohio St. 3d 110, 497 N. E. 2d 76 (1986) *(per curiam)*. Relying on the federal pre-emption analysis of *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238 (1984), the court held that the Atomic Energy Act of 1954, 68 Stat. 919, as amended, 42 U. S. C. § 2011 *et seq.* (1982 ed. and Supp. IV),

did not pre-empt Ohio from applying workers' compensation safety requirements unrelated to radiation hazards to nuclear facilities. 26 Ohio St. 3d, at 111–112, 497 N. E. 2d, at 77–78. In dissent, Justice Wright agreed with Goodyear's separate claim, not addressed by the majority, that in the absence of clearly expressed authorization from Congress, the Supremacy Clause barred the application of the state workers' compensation safety requirements to a federally owned facility. Justice Wright argued that Congress had not provided the necessary clear authorization to justify the application of the Ohio workers' compensation scheme. *Id.*, at 112–115, 497 N. E. 2d, at 78–80. We noted probable jurisdiction of Goodyear's appeal, 483 U. S. 1004 (1987), and now affirm the judgment of the Ohio Supreme Court on different reasoning.

## II

Although neither party contests our appellate jurisdiction over this case, we must independently determine as a threshold matter that we have jurisdiction. See *Brown Shoe Co. v. United States*, 370 U. S. 294, 305–306 (1962). Title 28 U. S. C. § 1257(2) gives this Court appellate jurisdiction over final judgments by the highest court of a State where the validity of a state statute is drawn in question on the ground of its being repugnant to the Constitution and the decision is in favor of its validity. "[A] state statute is sustained within the meaning of § 1257(2) when a state court holds it applicable to a particular set of facts as against the contention that such application is invalid on federal grounds." *Japan Line, Ltd. v. County of Los Angeles*, 441 U. S. 434, 441 (1979). In this case, the additional-award provision of Ohio's workers' compensation statute, as applied to the Portsmouth facility, was drawn in question on the ground that it violated the Supremacy Clause, and the Ohio Supreme Court upheld the statute's application.

The more difficult question is whether the judgment is "final" within the meaning of 28 U. S. C. § 1257(2), even though further proceedings are anticipated before the Ohio Indus-

trial Commission. The judgment of the Ohio Supreme Court requires that the Industrial Commission consider appellee's claim that his injury was caused by a failure to comply with a state safety regulation. In *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469 (1975), we recognized four situations in which this Court views a judgment as final under § 1257(2) although further state proceedings are contemplated. In the fourth category are cases

> "where the federal issue has been finally decided in the state courts with further proceedings pending in which the party seeking review here might prevail on the merits on nonfederal grounds, thus rendering unnecessary review of the federal issue by this Court, and where reversal of the state court on the federal issue would be preclusive of any further litigation on the relevant cause of action rather than merely controlling the nature and character of, or determining the admissibility of evidence in, the state proceedings still to come. In these circumstances, if a refusal immediately to review the state-court decision might seriously erode federal policy, the Court has entertained and decided the federal issue, which itself has been finally determined by the state courts for purposes of the state litigation." *Id.*, at 482–483.

We believe the present case falls within this fourth category. The federal question whether the additional workers' compensation award is barred by federal law has been finally determined by the Ohio Supreme Court, and a reversal of the Ohio Supreme Court's holding would preclude any further proceedings. In addition, even if appellant prevails before the Industrial Commission on nonfederal grounds, for example, if the Commission determines that there was no violation of the state safety regulation, the unreviewed decision of the Ohio Supreme Court might seriously erode federal policy in the area of nuclear production. The federal pre-emption analysis of the Ohio court sanctions direct state regulation of

nonradiological hazards at the Portsmouth facility, the only nuclear facility producing nuclear fuel for the Navy's nuclear fleet. Moreover, the decision has important implications for the regulation of federally owned nuclear production facilities in other States. Following our "pragmatic approach" to the question of finality, *Cox Broadcasting Corp.* v. *Cohn, supra,* at 486, we therefore conclude that the Ohio decision on the federal issue is a final judgment for purposes of 28 U. S. C. § 1257(2).

## III

It is well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides "clear and unambiguous" authorization for such regulation. *EPA* v. *State Water Resources Control Board,* 426 U. S. 200, 211 (1976); accord, *Hancock* v. *Train,* 426 U. S. 167, 178–179 (1976); *Mayo* v. *United States,* 319 U. S. 441, 445 (1943). As an initial matter, therefore, we consider whether the federally owned Portsmouth facility is likewise shielded from direct state regulation even though the facility is operated by a private party under contract with the United States.[1] We believe this question was answered in *Hancock* v. *Train,* 426 U. S., at 168, in which we faced the issue whether a State could enforce its pollution emission limitations against "federally owned or operated installations" by requiring that such installations obtain a state permit. One of the facilities at issue in *Hancock* was the Paducah Gaseous Diffusion Plant,

---

[1] The Ohio Supreme Court in this case failed to consider the fundamental distinction between state regulation of private facilities and state regulation of federal facilities. When dealing with state regulation of private facilities, analysis under the Supremacy Clause centers on whether Congress has taken affirmative action to pre-empt the state regulation in question. See *Hillsborough County* v. *Automated Medical Laboratories, Inc.,* 471 U. S. 707, 712–713 (1985). On the other hand, because the Supremacy Clause immunizes the activities of the Federal Government from state interference, *Mayo* v. *United States,* 319 U. S. 441, 445 (1943), direct state regulation of federal facilities is allowed only to the extent that Congress has clearly authorized such regulation.

which, like the Portsmouth facility, is a federally owned nuclear production facility operated by a private contractor. *Id.*, at 174, n. 23. Nuclear production facilities such as the Paducah and Portsmouth plants are authorized by statute to carry out a federal mission, with federal property, under federal control.[2] The Court struck down the permit requirement in *Hancock*, reasoning that without clear congressional authorization, "'the federal function must be left free' of [state] regulation." *Id.*, at 179, quoting *Mayo* v. *United States, supra*, at 447. *Hancock* thus establishes that a federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation.[3]

In this case, however, we are not presented with a direct state regulation of the operation of the Portsmouth facility. Rather, the case involves the imposition of a supplemental

---

[2] With certain limited exceptions, the DOE, as agent of the United States, is the exclusive owner of all nuclear production facilities. See 42 U. S. C. § 2061(a); see also Department of Energy Organization Act, 91 Stat. 577, 42 U. S. C. § 7151(a) (transferring responsibility to DOE from the Energy Research and Development Administration). The DOE is authorized to contract with private parties to operate its facilities, but these private contractors are subject to the direction and supervision of the DOE. See 42 U. S. C. § 2061(b); H. R. Rep. No. 2181, 83d Cong., 2d Sess., 14 (1954) ("In connection with its own production facilities, . . . the Commission is permitted to have the actual operation carried on by other persons under contract to it and under its direction and control"). This federal control over the production of nuclear material is an important aspect of federal nuclear energy policy. See 42 U. S. C. § 2013(c).

[3] Appellees and *amici* argue that *Hancock* should be read as applying only to situations in which the state regulation may act to prohibit the operation of the federally owned facility. Although *Hancock* involved a state regulation requiring an operating permit, the central issue presented was the power of the State to enforce its emissions regulations. See *Hancock* v. *Train*, 426 U. S., at 181. Under the Supremacy Clause, we discern no important difference between the authority to order compliance with state regulations and the authority to require a permit prior to operating a facility. In both settings the State is claiming the authority to dictate the manner in which the federal function is carried out.

award of workers' compensation, chargeable against Goodyear, for an injury caused by Goodyear's failure to comply with a state safety regulation. Appellant and the Solicitor General argue that the application of the Ohio additional award provision is nonetheless tantamount to a regulation of the Portsmouth facility and is thus invalid under the Supremacy Clause. We need not decide this issue, however, for we conclude that even if the provision is sufficiently akin to direct regulation of the Portsmouth facility to be potentially barred by the Supremacy Clause, ch. 822, 49 Stat. 1938, 40 U. S. C. § 290, provides the requisite clear congressional authorization for the application of the provision to workers at the Portsmouth facility.

Section 290 provides in relevant part:

> "Whatsoever constituted authority of each of the several States is charged with the enforcement of and requiring compliances with the State workmen's compensation laws of said States and with the enforcement of and requiring compliance with the orders, decisions, and awards of said constituted authority of said States shall have the power and authority to apply such laws to all lands and premises owned or held by the United States of America by deed or act of cession, by purchase or otherwise, which is within the exterior boundaries of any State and to all projects, buildings, constructions, improvements, and property belonging to the United States of America, which is within the exterior boundaries of any State, in the same way and to the same extent as if said premises were under the exclusive jurisdiction of the State within whose exterior boundaries such place may be."[4]

---

[4] Although the language and history of § 290 indicate that it is addressed to federal enclaves, areas over which the United States has assumed exclusive jurisdiction under U. S. Const., Art. I, § 8, cl. 17, see S. Rep. No. 2294, 74th Cong., 2d Sess. (1936), both appellant and the Solicitor General concede, and we agree, that it authorizes the application of workers'

Both appellant and the Solicitor General concede that the initial workers' compensation award received by respondent Miller is authorized by § 290. They contend, however, that § 290 does not authorize the supplemental award provided in Ohio's workers' compensation law when an employer violates a specific state safety regulation. At bottom, appellant and the Solicitor General argue that the phrase "workmen's compensation laws" in § 290, which is not defined, was not intended to include the additional-award provision in Ohio's workers' compensation law. Appellant claims that in the absence of a precise definition, we should infer that Congress envisioned the typical workers' compensation Act, under which workers are automatically entitled to certain benefits when they suffer a work-related injury, without regard to the employer's fault. A State's authority to enforce its workers' compensation laws under § 290, appellant continues, should be limited to such standard awards.

We do not believe appellant's construction of § 290 can be squared with the statute's language and history. Section 290 provides that a state authority charged with enforcing "workmen's compensation laws," which in Ohio is the Industrial Commission, "shall have the power and authority to apply such laws" to federal premises "in the same way and to the same extent as if said premises were under the exclusive jurisdiction of the State." This language places no express limitation on the type of workers' compensation scheme that is authorized.[5] On its face, § 290 compels the same workers'

---

compensation laws to federal facilities like the Portsmouth plant that are not federal enclaves.

[5] There is no doubt that the supplemental award provision is an integral part of the Ohio workers' compensation statute. The provision was enacted in 1923 as an amendment to the existing workers' compensation scheme. The amendment abolished the right to bring an action at law when the employer failed to comply with specific safety requirements and substituted the additional percentage award in the event of such a failure. *State ex rel. Bailey* v. *Krise*, 18 Ohio St. 2d 191, 195–197, 249 N. E. 2d 55, 58–59 (1969).

compensation award for an employee injured at a federally owned facility as the employee would receive if working for a wholly private facility. In addition, at the time of the passage of § 290 in 1936, workers' compensation laws provided a wide variety of compensation schemes that do not fit neatly within appellant's view of the "typical" scheme. At least 15 States provided remedies in addition to basic workers' compensation awards when an employee was injured because of specified kinds of employer misconduct.[6] Eight of these States, including Ohio, provided supplemental awards when the employer violated a specific safety regulation.[7] We gen-

---

[6] See 1925 Ariz. Sess. Laws, ch. 83, § 65 (option to sue if injury from employer's "wilful misconduct"); 1917 Cal. Stats., ch. 586, § 6(b) (50% increase in compensation, not to exceed $2,500, if injury caused by serious and willful misconduct of employer); 1916 Ky. Acts, ch. 33, §§ 3, 29 (option to sue for intentional injury and 15% increase for intentional failure to comply with statute); 1911 Mass. Acts, ch. 751, pt. 2, § 3 (100% increase if injury caused by employer's serious and willful misconduct); 1925 Mo. Laws, § 3 (15% increase for failure to comply with any statute); 1929 N. M. Laws, ch. 113, § 7 (50% increase if employer fails to provide safety devices required by law); 1929 N. C. Sess. Laws, ch. 120, § 13 (10% increase for willful failure to comply with any statutory requirement); Ohio Const., Art. 2, § 35 (15% to 50% increase for violation of specific safety requirement); 1921 Ore. Laws, ch. 311, § 6 (option to sue for intentional injury by employer); 1936 S. C. Acts, No. 610, § 13 (10% increase for willful failure to comply with statute); 1917 Tex. Gen. Laws, ch. 103, § 5 (option to sue for "willful act or omission" or "gross negligence" of employer); 1921 Utah Laws, ch. 67, § 1 (15% increase for willful failure to comply with any statute); 1911 Wash. Laws, ch. 74, § 6 (option to sue for intentional injury); 1913 W. Va. Acts, ch. 10, § 28 (option to sue for intentional injury); 1915 Wis. Laws, ch. 378, § 1(h) (15% increase for violation of statute); see also 2A A. Larson, Law of Workmen's Compensation § 69.10 (1987).

[7] See 1916 Ky. Acts, ch. 33, § 29; 1925 Mo. Laws § 3; 1929 N. M. Laws, ch. 113, § 7; 1929 N. C. Sess. Laws, ch. 120, § 13; Ohio Const., Art. II, § 35; 1936 S. C. Acts, No. 610, § 13; 1921 Utah Laws, ch. 67, § 1; 1915 Wis. Laws, ch. 378, § 1(h). For the present versions of these laws, see Ky. Rev. Stat. § 342.165 (1983); Mo. Rev. Stat. § 287.120(4) (1986); N. M. Stat. Ann. § 52–1–10(B) (1978); N. C. Gen. Stat. § 97–12 (1985); Ohio Const., Art. II, § 35; S. C. Code § 42–9–70 (1976); Utah Code Ann. § 35–1–12 (1953); Wis. Stat. § 102.57 (1985–1986).

erally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts. See *Director, OWCP* v. *Perini North River Associates*, 459 U. S. 297, 319–320 (1983). In the absence of affirmative evidence in the language or history of the statute, we are unwilling to assume that Congress was ignorant of the substantial number of States providing additional workers' compensation awards when a state safety regulation was violated by the employer. Indeed, Congress appears to have recognized the diversity of workers' compensation schemes when it provided that workers' compensation would be awarded to workers on federal premises "in the same way and to the same extent" as provided by state law. The meaning of "workmen's compensation laws" in § 290, of course, is not infinitely elastic. We need not address the outer boundaries of that term in this case, however, because we believe it is clear that Congress intended Ohio's law and others of its ilk, which were solidly entrenched at the time of the enactment of § 290, to apply to federal facilities "to the same extent" that they apply to private facilities within the State.

The only evidence in the legislative history of § 290 that appellant and the Solicitor General muster in support of their position is that Congress rejected a proposal that would have authorized States to apply state safety and insurance laws directly to federal projects. See S. Rep. No. 2294, 74th Cong., 2d Sess., 2 (1936). But Congress' reluctance to allow direct state regulation of federal projects says little about whether Congress was likewise concerned with the incidental regulatory effects arising from the enforcement of a workers' compensation law, like Ohio's, that provides an additional award when the injury is caused by the breach of a safety regulation. The effects of direct regulation on the operation of federal projects are significantly more intrusive than the incidental regulatory effects of such an additional award provision. Appellant may choose to disregard Ohio safety regulations and simply pay an additional workers' compensation

award if an employee's injury is caused by a safety violation. We believe Congress may reasonably determine that incidental regulatory pressure is acceptable, whereas direct regulatory authority is not.[8]   Cf. *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S., at 256 (Congress was willing to accept regulatory consequences of application of state tort law to radiation hazards even though direct state regulation of safety aspects of nuclear energy was pre-empted).   Because the permission of incidental regulation is consistent with the preclusion of direct regulation, the legislative history relied on by appellant and the Solicitor General does not undermine the plain language of § 290.   We conclude that the additional award provision of Ohio's workers' compensation law is unambiguously authorized by § 290 and therefore does not run afoul of the Supremacy Clause.[9]   Accordingly, the judgment of the Ohio Supreme Court is affirmed.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE WHITE, with whom JUSTICE O'CONNOR joins, dissenting.

The Court's seminal decision in *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819), establishes the principle that the

---

[8] Prior to enacting § 290, Congress had authorized recovery of damages under state tort law by persons injured or killed on federal enclaves.   See ch. 15, 45 Stat. 54, 16 U. S. C. § 457.   Thus, at the time § 290 was enacted, Congress already had evinced a willingness to have state law exert incidental regulatory pressures on federal facilities.

[9] Appellant also argues that the Atomic Energy Act of 1954, 68 Stat. 919, as amended, 42 U. S. C. § 2011 *et seq.* (1982 ed. and Supp. IV), and the DOE's health and safety regulations promulgated under the 1954 Act, pre-empt the award of additional compensation based on state health and safety regulations.   Nothing in the 1954 Act, however, expresses an intent to repeal § 290 as applied to nuclear production facilities, nor can we read the 1954 Act as implicitly repealing § 290 because the two are not inconsistent.   Section 290 is therefore as effective an authorization to apply state workers' compensation laws after the passage of the 1954 Act as before.

States may not exercise their sovereign powers so as to control those instrumentalities of the United States which have been judged necessary and proper to carry into effect federal laws and policies. Although the narrow issue in that case involved only the assertion by the State of Maryland of its power to tax a federal bank, the Court laid down a more general construction of the Supremacy Clause that has proved to be enduring in its force of reason. As the Court stated: "The attempt to use [state sovereign power] on the means employed by the government of the Union, in pursuance of the constitution, is itself an abuse, because it is the usurpation of a power which the people of a single State cannot give." *Id.*, at 430. The contrary principle would be "capable of arresting all the measures of the government, and of prostrating it at the foot of the States. The American people have declared their constitution, and the laws made in pursuance thereof, to be supreme; but this principle would transfer the supremacy, in fact, to the States." *Id.*, at 432. "The result," the Court concluded, "is a conviction that the States have no power, by taxation *or otherwise,* to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *Id.*, at 436 (emphasis added).

Although, again, the narrow issue in *McCulloch* concerned only the power to tax, which as the Court noted "involves the power to destroy," *id.*, at 431, the passages quoted above demonstrate that the decision was formulated, explicitly, with sufficient breadth to apply to other measures a State might impose that would "retard, impede, burden, or in any manner control" the operations of federal instrumentalities. *Id.*, at 436. And, clearly, the power to regulate also involves "the power to destroy" if the regulatory web is spun too tightly around its object. More commonly, however, the additional and perhaps conflicting regulations imposed by a

State would simply burden the federal instrumentality, interfere with its operations, and frustrate the federal objectives it is designed to achieve. Nonetheless, the law has long been settled that such regulation cannot be imposed on federal instrumentalities by the States, under the Supremacy Clause, unless the Federal Government directly indicates that it finds such impositions to be consistent with the proper pursuit of its powers under federal law. *Hancock* v. *Train*, 426 U. S. 167, 178–179 (1976); *Mayo* v. *United States*, 319 U. S. 441, 447–448 (1943).

In this case the State of Ohio seeks to require a federal nuclear facility, which all concede to be the equivalent of any other federal instrumentality,[1] to make a "bonus" money payment to workers who are injured when the injury results from the facility's failure to comply with "any specific [state] requirement for the protection of the lives, health or safety of employees." Ohio Const., Art. II, § 35. Although the Court declines to decide whether this provision of state law is tantamount to a regulation of the facility or to some similarly impermissible imposition upon it, *ante*, at 182, I believe that no other view is tenable on the facts before us.

Initially, the proper focus under the Supremacy Clause is not the avowed purpose for which the State adopts a given provision but the actual effect of the provision on the operation of a federal instrumentality and on its ability to achieve the objectives of federal law and policy for which it has been created. *Perez* v. *Campbell*, 402 U. S. 637, 651–652 (1971). The Court has held that even the general framework of state workers' compensation laws may not be applied at places that lie within the exclusive jurisdiction of the Federal Government. *Murray* v. *Gerrick & Co.*, 291 U. S. 315 (1934). And

---

[1] The Court recognizes, *ante*, at 180–181, and I agree, that under our precedents the facility here, which is federally owned but is operated by a private party under contract with the Federal Government, must be treated as a federal instrumentality for the purpose of applying the Supremacy Clause. *Hancock* v. *Train*, 426 U. S. 167, 174, n. 23 (1976).

yet the provision of Ohio law at issue in this case is much more specific in its application, and in its regulatory effect upon this federal facility, than is the general framework of such laws. The basic feature of the state statutory regimes for the compensation of workers is that the common law governing the relationship between employer and employee, whose doctrines had become so disadvantageous to employees, is replaced by an automatic entitlement of the employee to certain benefits when injured in the course of employment. See 1 A. Larson, Law of Workmen's Compensation §§ 1.10–3.40 (1985). Unlike this basic scheme, however, which does not pressure the federal facility to alter its operations in any specific respect to comply with particular state regulations, the Ohio law exposes the facility to a special penalty if it does not comply with "any specific [state] requirement for the protection of the lives, health or safety of employees." Ohio Const., Art. II, § 35. The specificity of these requirements is much more intrusive on the management of the federal facility than even a state workers' compensation law that would preserve the employee's right to sue the employer for willful misconduct or for intentional injury, as do the laws of several States. In terms of the regulatory impact on the federal instrumentality, it is one thing for the facility to know that it should manage its operations so as to minimize the risk of injuries to its employees; it is quite another to expose it to money penalties for failing to comply with the whole panoply of specific state regulations that dictate precise rules to govern very detailed aspects of employee health and safety.

It is quite obvious that an attempt by the State of Ohio to impose these same kinds of specific regulations on the federal facility, directly, by obliging the facility to satisfy them all or else to suspend operations, would run afoul of the Supremacy Clause. The rule at issue here has a similar effect. Appellees claim that the federal facility violated a provision in the code of safety requirements, which the State of Ohio has

adopted by administrative rule. The provision sets out specific restrictions on mobile work platforms and rolling platforms, and says that "[e]xposed surfaces shall be free from sharp edges, burrs or other projecting parts." Ohio Admin. Code § 4121:1-5-03(D)(2) (1987). There are thousands of such requirements in the administrative rules adopted by the Ohio Industrial Commission's Division of Safety and Hygiene, which in their current version run to well over 200 double-columned pages of meticulous prescriptions, illustrated in minute detail with diagrams, graphs, and charts, see Ohio Admin. Code, ch. 4121:1 (1987), and there are countless other specific requirements in the State's other laws and regulations. It will not do to say that the State of Ohio has not attempted to regulate this facility directly, but simply has exposed it to possible money payments for failure to comply with these specific requirements, since such requirements are often enforced by fines rather than by enjoining specific conduct, and in any event the apparent means of enforcing all of these rules is through the workers' compensation awards permitted under state law.

Nor does it make sense to say that the State of Ohio is not fining the facility, but is only penalizing it in the form of additional compensation to injured workers. It cannot matter that the extra payment is made only in the event of an actual injury; one might just as well argue that a regulatory fine would not be a burden if it were imposed not every day but only on the less frequent occasions when inspections are held. Even more to the point, if the amount of the money penalty were very large, the direct compulsion that would be brought to bear upon the federal facility to knuckle under and scrutinize its operations for compliance with every jot and tittle of the state administrative rules is apparent. The case is no different because the amount of the extra "bonus" award in any given instance may be small. In *Ohio* v. *Thomas*, 173 U. S. 276 (1899), the contested provision involved nothing

more than whether the person in charge of an eating house at a federal home for disabled veterans was required under state law to put out a small printed sign that would read "oleomargarine sold and used here" when he served oleomargarine to the inmates. The state law was found to be invalid as applied to the federal facility, under the Supremacy Clause, without regard to the plain fact that the contested imposition was such a slight one, for the *principle* remains the same in such a case.[2]

The mechanics of the Ohio provision, as interpreted by the Ohio courts, reinforce both the obvious regulatory effect of this state law and the important differences between such a provision and a basic workers' compensation scheme. First, unlike workers' compensation, which provides an award to every employee who is injured on the job regardless of how the injury occurred, the additional payment here is only available when the facility fails to comply with a state regulatory "requirement." Even the regulatory provisions embodied in federal laws and rules have been held not to activate the extra money penalty afforded by state law. See, *e. g.*, *State ex rel. Ish* v. *Industrial Comm'n*, 19 Ohio St. 3d 28, 482 N. E. 2d 941 (1985); *State ex rel. Roberts* v. *Industrial Comm'n*, 10 Ohio St. 3d 1, 460 N. E. 2d 251 (1984). Second, the necessity that the state requirement be "specific" in its dictates has been strictly construed. It "does not comprehend a general course of conduct or general duties or obligations flowing from the relation of employer and employee, but embraces such lawful, specific and definite requirements or standards of conduct as are prescribed by statute or by orders of the Industrial Commission." *State ex rel. Trydle* v. *Industrial Comm'n*, 32 Ohio St. 2d 257, 291 N. E. 2d 748,

---

[2] If this point is thought to matter, however, it is worth noting that Ohio's penalty scheme allows for larger money payments than does any other State. 2A A. Larson, Law of Workmen's Compensation § 69.10 (1987). The penalty award at issue in this case would amount to somewhere between $1,328 and $4,429. Brief for Appellee Miller 3, n. 4.

750 (1972). The question whether a particular safety requirement is sufficiently "specific" to support an extra money penalty has often been litigated in the Ohio courts, and such awards are invalidated unless the claimant is able to demonstrate that the specific requirement "demands that some particular and definite act or thing be done." *State ex rel. Holdosh* v. *Industrial Comm'n,* 149 Ohio St. 179, 181–182, 78 N. E. 2d 165, 166 (1948). See also *State ex rel. Rae* v. *Industrial Comm'n,* 136 Ohio St. 168, 24 N. E. 2d 594 (1939); *Trydle, supra; State ex rel. Jack Conie & Sons Corp.* v. *Industrial Comm'n,* 56 Ohio St. 2d 150, 382 N. E. 2d 1366 (1978). In order to secure the penalty award, the employee must show that the regulatory requirement is "definite" in the sense that it leaves *no discretion* to the employer—does not make it at all "a matter of his own choosing"—how to comply with the specific requirement. *State ex rel. Fast & Co.* v. *Industrial Comm'n,* 176 Ohio St. 199, 201, 198 N. E. 2d 666, 667 (1964).

Since this provision of Ohio law exacts a monetary penalty only for failure to comply with state laws and regulations, and indeed only for failure to comply with those state regulations which are so specific that they dictate precisely what steps the employer must take to avoid this increased financial exposure, the principal effect of this provision can only be to induce the employer to adhere to each of the various health and safety regulations that the State has adopted. And therefore the impact of such a provision on a federal instrumentality presents a very different problem, for purposes of analysis under the Supremacy Clause, from that posed by the mere application of a state workers' compensation scheme.

The Court today skirts these difficulties and rests its disposition on the view that, no matter how extensive the actual regulatory effect of this state law may be, Congress has sanctioned its application to federal instrumentalities by enacting 40 U. S. C. § 290. The Court finds in this statute the "unam-

biguous" and "clear congressional mandate" approving such state regulation that we have required in past cases. *Kern-Limerick, Inc.* v. *Scurlock,* 347 U. S. 110, 122 (1954); *EPA* v. *State Water Resources Control Board,* 426 U. S. 200, 211 (1976). I disagree.

Section 290 authorizes each State to apply its "workmen's compensation laws" to all "property belonging to the United States of America, which is within the exterior boundaries of any State, in the same way and to the same extent as if said premises were under the exclusive jurisdiction of the State." The crux of the matter is whether Congress intended by this provision to open up all federal instrumentalities to the kind of potentially onerous regulation of their operations that is imposed by the Ohio provision for money penalties. I do not believe that in authorizing the States to apply these compensation laws to federal instrumentalities "in the same way and to the same extent" as they apply to other employers, Congress had any purpose to expose federal establishments to coercive financial pressure to comply with a slew of detailed state regulations about how to carry on their operations. Nothing in the statute or its background suggests that Congress had such an intent, and certainly nothing at all suggests that any such position was "clearly" or "unambiguously" approved by Congress. I am unimpressed by the fact that a small fraction of the States permitted such additional awards at the time § 290 was passed; if the "clear congressional mandate" approving such state regulations cannot be found in the federal statute itself, then the obscure practices of a few States at the time of enactment will not suffice to create one. Congress need not explicitly disapprove every contrary aspect of the workers' compensation laws of the several States in order to refrain from giving them its "unambiguous" blessing.

Section 290 was enacted in response to the Court's decision in *Murray* v. *Gerrick & Co.,* 291 U. S. 315 (1934), which had held that state workers' compensation laws may not be ap-

plied at all in areas under the exclusive jurisdiction of the Federal Government. The purpose of the bill as stated was simply the humanitarian one of "correcting this situation," in which workers employed on federal projects were deprived of the benefits of coverage purely because of an oddity of location. S. Rep. No. 2294, 74th Cong., 2d Sess., 2 (1936); H. R. Rep. No. 2656, 74th Cong., 2d Sess., 1 (1936). As the Senate Report explained at greater length: "The purpose of the amended bill is to fill a conspicuous gap in the workmen's compensation field by furnishing protection against death or disability to laborers and mechanics employed by contractors or other persons on Federal property." S. Rep. No. 2294, at 1.

That Congress intended nothing more than to provide much-needed coverage to these workers is shown by the single revealing item in the scanty legislative history of the statute. The House version of the bill not only would have extended coverage to these workers, but also would have subjected federal property to state safety and insurance regulations and would have authorized state officers to enter upon federal premises in furtherance of these aims. The Senate struck out these latter provisions at the request of the Executive Branch of the Federal Government, noting expressly that they "would not only produce conflicts of authority between State and Federal officers but would also mark a wide departure from the well-established principle that Federal officers should have complete charge of any regulations pertaining to Federal property." S. Rep. No. 2294, at 2. As no such departure from normal practice was intended by Congress, the Senate version of the bill was enacted.

This background to the enactment of § 290 shows that Congress did not intend to expose federal instrumentalities to the kind of detailed and mandatory regulation that is provided by the Ohio law at issue in this case. The Court's response on this point is simply to assert that "[t]he effects of direct regulation on the operation of federal projects are significantly

more intrusive than the incidental regulatory effects of such an additional award provision." *Ante*, at 185. In some instances the Court may be correct that the effects of direct regulation could be more intrusive than a provision for penalty awards, but the question here is not whether these two things are exactly the same, but simply whether the "regulatory effects" of the penalty provision, which as set out above are far from "incidental," are the kinds of effects that Congress did not intend to sanction when it enacted § 290. These effects are clearly impermissible under the rationale that the Senate articulated for removing from the bill the two obnoxious provisions that had been included in the House version. And even if I were to conclude that Congress had acted ambiguously on this score, I would at least be forced to conclude that Congress offered no "clear" or "unambiguous" mandate for the kind of specific regulatory compulsion that this Ohio law exerts upon this federal facility.

I therefore respectfully dissent.