# United States Court of Appeals for the Federal Circuit

---

**DWA HOLDINGS LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2017-1358

---

Appeal from the United States Court of Federal Claims in No. 1:15-cv-00824-NBF, Senior Judge Nancy B. Firestone.

---

Decided: May 9, 2018

---

GREGORY G. GARRE, Latham & Watkins LLP, Washington, DC, argued for plaintiff-appellant. Also represented by DREW CURTIS ENSIGN, MIRIAM FISHER, BRIAN C. MCMANUS, BENJAMIN SNYDER.

JACOB EARL CHRISTENSEN, Tax Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by DAVID A. HUBBERT, GILBERT STEVEN ROTHENBERG, FRANCESCA UGOLINI.

---

Before PROST, *Chief Judge,* O'MALLEY and TARANTO, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

This appeal concerns the scope of section 101(d) of the American Jobs Creation Act of 2004 ("AJCA"), Pub. L. No. 108-357, 118 Stat. 1418 (2004), a "transitional rule" that places a limit on "the amount includible in gross income" for "transactions during 2005 and 2006." DWA Holdings, LLC ("DWA") appeals from the U.S. Court of Federal Claims' ("Claims Court") summary judgment ruling that income DWA earned overseas after 2006 pursuant to a 2006 transaction was not entitled to transitional benefits under section 101(d).

For the reasons set forth below, we conclude that the Claims Court erred in holding that section 101(d) only provided transitional relief for extraterritorial income earned in 2005 and 2006. Accordingly, we reverse and remand for further proceedings.

## I. BACKGROUND

In this case, as in many other cases involving statutory construction, the history underlying Congress's decision to enact the statute at issue merits discussion. We discuss some of that history briefly before turning to the factual and procedural history of this case.

### A. Historical Background

The AJCA was enacted against a backdrop of decades of dialogue between the United States and other countries with whom we have treaty obligations. As a starting point, although income earned by American taxpayers typically is subject to taxation in the United States, regardless of where in the world the income is earned, other countries, such as those in Europe, only tax income earned within their borders. *See* H.R. Rep. No. 106-845, at 13 (2000).

Although the possibility of "double taxation" of foreign income is a concern both in the United States and abroad, countries take different measures to address it. *Id.* The United States generally provides *credits* for taxes paid to foreign governments on income earned abroad, while European and other systems typically *exempt* from taxation income earned abroad. *Id.* Congress has long believed that the exemption method used in Europe and elsewhere puts American companies at a disadvantage in terms of exports. *See* Staff of Joint Comm. on Internal Revenue Taxation, 92d Cong., General Explanation of the Revenue Act of 1971, at 85–86 (1972); *see also id.* at 86 (noting that "other major trading nations encourage foreign trade by domestic producers in one form or another," and describing common methods used); H.R. Rep. No. 106-845, at 13–14 (describing the rationale for the enactment of the extraterritorial income regime).

Over the years, Congress has enacted a number of tax regimes in an effort to address the imbalance it perceived and to create a more level playing field for domestic producers. Each time, however, the United States received push back from its European trading partners, who claimed each taxing structure Congress devised resulted in an effective export subsidy for U.S. producers, in violation of our treaty obligations.

While Congress denied the claims made against its respective tax regimes, in the interest of accommodating its trading partners and paying due respect to the rulings of international trade bodies, it continued to revise the relevant U.S. tax regimes. Importantly, however, Congress sought to ease the burden on domestic producers imposed by these responsive tax revisions. It did so primarily by providing transitional relief for transactions occurring during specified years following passage of each of these new tax regimes.

One example of such transitional relief appeared in the FSC Repeal and Extraterritorial Income Exclusion Act of 2000 ("ETI Act"), Pub. L. No. 106-519, 114 Stat. 2423 (2000), enacted on November 15, 2000. While the ETI Act applied generally to "transactions after September 30, 2000," ETI Act § 5(a), the Act allowed previously established Foreign Sales Corporations ("FSCs") to continue receiving favorable tax treatment for any "transactions" that occurred before January 1, 2002, more than a year after the passage of the FSC repeal, ETI Act § 5(c)(1)(A). Specifically, the law provided that, "[i]n the case of a FSC (as so defined) in existence on September 30, 2000, and at all times thereafter, the amendments made by this Act shall not apply to any transaction in the ordinary course of trade or business involving a FSC which occurs" either "before January 1, 2002" or "after December 31, 2001, *pursuant to a binding contract . . .* between the FSC (or any related person) and any person which is not a related person; and . . . in effect on September 30, 2000, and at all times thereafter." *Id.* (emphasis added).

The European Union challenged the ETI regime—in particular, its transitional rules—in the World Trade Organization ("WTO"). The WTO ruled against the United States, and, in October 2004, Congress responded by repealing the ETI Act and enacting the AJCA, the tax scheme before us in this appeal. *See* H.R. Rep. No. 108-548(I), at *7 (June 16, 2004) (repealing the exclusion for extraterritorial income set forth in 26 U.S.C. § 114); AJCA § 101(a). In this go-round, Congress did not enact a regime specific to exports; instead, it created a more diffuse benefit for all "domestic production activities," regardless of whether they resulted in export sales. AJCA § 102. The House Report accompanying the AJCA explained that the reason for the repeal was to comply with the WTO's decisions: "The Committee believes it is important that the United States, and all members of the

WTO, comply with WTO decisions and honor their obligations under WTO agreements. Therefore, the Committee believes that the ETI regime should be repealed." H.R. Rep. No. 108-548(I), at 114 (2004).

Section 101 of the AJCA, titled "Repeal of Exclusion for Extraterritorial Income," contains a number of provisions that operate together to "phase out" the relevant portions of the ETI Act and help domestic companies transition to a new regime. First, section 101(a) expressly repeals 26 U.S.C. § 114, the provision in the ETI Act that excluded extraterritorial income from taxation. AJCA § 101(a). And section 101(c), titled "Effective Date," provides that the repeal is effective for "transactions after December 31, 2004"—two months after the enactment of the statute. *Id.* § 101(c).

Section 101(d), the provision at issue in this case, provides the following "Transitional Rule for 2005 and 2006":

(1) IN GENERAL.—In the case of transactions during 2005 or 2006, the amount includible in gross income by reason of the amendments made by this section shall not exceed the applicable percentage of the amount which would have been so included but for this subsection.

(2) APPLICABLE PERCENTAGE.—For purposes of paragraph (1), the applicable percentage shall be as follows:

(A) For 2005, the applicable percentage shall be 20 percent.

(B) For 2006, the applicable percentage shall be 40 percent.

*Id.* § 101(d). Finally, Congress included a "grandfather provision" in AJCA section 101(f), titled "Binding Contracts," providing that the repeal "shall not apply" to certain transactions occurring pursuant to a "binding

contract" that was "in effect on September 17, 2003, and at all times thereafter." *Id.* § 101(f).

The European Union again objected before the WTO, arguing that the United States had failed to entirely remove the prohibited ETI subsidies. Specifically, it argued that the grandfather provision of section 101(f) improperly maintained the full ETI tax benefit for certain transactions indefinitely, while the transitional rule of section 101(d) provided a reduced, but still objectionable, ETI tax benefit relating to transactions entered into in 2005 and 2006. The United States, in filings made to the WTO, characterized section 101(f) as "exempt[ing] certain pre-existing binding contracts from the repeal of the ETI tax exclusion." J.A. 1863. Turning to section 101(d), it explained that the provision "provides for a two-year phase out of the ETI Act tax exclusion." *Id.* It further submitted that, in dispute settlement negotiations with European community members, "[a]lthough there were legislative proposals then pending for transition periods as long as five years, Congress accommodated the E[uropean Communities'] concerns by limiting the transition period to two years, and by reducing the amount of the tax exclusion in each year." *Id.* And, according to the United States, "Congress did so with the understanding that, together with repeal, limiting the transition period to two years would resolve the dispute." *Id.* In other words, the United States made clear that, while Congress was sensitive to the WTO's concerns, it would continue to seek out ways to alleviate any undue harshness to domestic companies caused by the need to make continual changes to our tax regimes.

In September 2005, a WTO panel agreed with the European Union that the ACJA improperly maintained certain ETI subsidies, and stated that the United States therefore continued to fail to implement fully the WTO's recommendations and rulings to withdraw the prohibited subsidies. Specifically, it found that, to the extent sec-

tion 101 of the AJCA "maintains prohibited FSC and ETI subsidies through these transitional and grandfathering measures, it continues to fail to implement fully" directives to "withdraw the prohibited subsidies and to bring its measures into conformity with its obligations under the relevant covered agreements."  J.A. 1839.  A WTO appellate body affirmed the panel's decision.

In May 2006, Congress repealed section 101(f) in the Tax Increase Prevention and Reconciliation Act of 2005 ("TIPRA"), Pub. L. 109-222, § 513, 120 Stat. 345, 366 (2006), effective for "taxable years beginning after the date of the enactment of this Act [May 17, 2006]."  It did not repeal or revise section 101(d), however.

## B.  Factual Background

None of the material facts are in dispute.  DWA is a Delaware corporation with its principal place of business in Glendale, California.  It began as a division of Dream-Works Studios (formally, DreamWorks L.L.C.), a film production label formed in 1994.  DWA is in the business of producing animated motion pictures, and has relied on third parties for the distribution of its films.

DWA was spun off from DreamWorks Studios in a public offering on October 27, 2004, and thereafter entered into a distribution agreement dated December 9, 2005 ("2005 Agreement") with Paramount Pictures Corporation ("Paramount") and DreamWorks L.L.C. to replace a pre-existing distribution agreement.  The 2005 Agreement granted Paramount, which was set to acquire Dream-Works L.L.C., the exclusive, worldwide rights to distribute certain of DWA's then-existing and future animated feature films.

Paramount acquired DreamWorks L.L.C. on January 31, 2006, and the parties terminated and reinstated the 2005 Agreement by entering into a new distribution agreement ("2006 Transaction"), adding Viacom Overseas

Holdings C.V. ("Viacom"), an affiliate of Paramount, as a party thereto.  The 2006 Transaction is nearly identical in all material respects to the 2005 Agreement, except that Viacom replaced Paramount as the distributor of the licensed material outside of the United States and Canada.  With limited exception, the motion pictures that are the subject of the 2006 Transaction were produced in the United States, and all licenses granted under the 2006 Transaction are for use by the licensees outside of the United States.  The term of each license is determined on a film-by-film basis.

Pursuant to the 2006 Transaction, DWA recognized qualifying ETI as contemplated under former section 114 of the Internal Revenue Code of 1986, as amended, for the taxable year ending December 31, 2006 ("Tax Year 2006").  For Tax Year 2006, DWA invoked section 101(d), and excluded from gross income 60 percent of the extraterritorial income that constituted "Qualifying Foreign Trade Income" it received in Tax Year 2006 attributable to the 2006 Transaction.  At the same time, DWA included in gross income on its 2006 Form 1120, U.S. Corporation Income Tax Return, 40 percent of its extraterritorial income attributable to the 2006 Transaction.  The IRS agreed that DWA's claimed exclusion under section 101(d) for Tax Year 2006 was allowable.  DWA continued to receive income from its 2006 license during the calendar years ending in 2007, 2008, and 2009.

DWA timely filed its tax forms for the years 2007, 2008, and 2009, but did not claim any exclusion under section 101(d) for extraterritorial income recognized in those calendar years attributable to the 2006 Transaction.  These consolidated forms were selected for a routine IRS examination.  During that examination, DWA realized that it had not sought benefits under section 101(d), despite discovering it was entitled to do so.  DWA, thus, timely filed affirmative income tax refund claims for tax years 2007, 2008, and 2009, asserting that it was entitled

to an exclusion under section 101(d) for qualifying extra-territorial income recognized in these years attributable to the 2006 Transaction.  The total amount DWA claimed it was owed in refunds exceeded $4.4 million, representing 60 percent of the income received pursuant to the 2006 license during those three years.  The IRS disallowed DWA's refund claims on November 3, 2014.  DWA paid the disputed amount in full.

## C.  Procedural Background

On August 3, 2015, DWA sued the government in the Claims Court under the Tucker Act, seeking to recover its claimed refund.  The parties filed cross-motions for summary judgment on the dispositive legal question of whether section 101(d) applies to income received in 2007, 2008, and 2009 from a transaction finalized in 2006.  The Claims Court sided with the government, holding that "the tax benefits provided in section 101(d)'s transition rule were limited to income recognized in 2005 or 2006." *DreamWorks Animation SKG, Inc. v. United States*, 128 Fed. Cl. 624, 630 (2016).  In reaching this conclusion, the Claims Court concluded that the references in subsection 101(d)(2) to "[f]or 2005" and "[f]or 2006" should be interpreted to refer to the latter part of subsection 101(d)(1), which refers to "the amount includible in gross income," rather than the earlier part of subsection 101(d)(1), which explains that the transitional rule applies "[i]n the case of transactions during 2005 and 2006." *Id.*

The Claims Court also believed that section 101(f)'s "Binding Contract Rule" supported the government's position, as this rule was the only way in which Congress sought "to confer long-term benefits to taxpayers." *Id.* at 631.  The court also found that section 102's use of the phrase "taxable year" was not significant in light of the plain language of section 101(d). *Id.*  Finally, although the Claims Court found the language of section 101(d) unambiguous, it examined the legislative history, and

concluded that nothing in it supported DWA's position. The Claims Court also concluded that Congress's decision to repeal section 101(f) in 2006 supported the government's interpretation because it reflected a congressional desire to comply with the WTO rulings. *Id.* at 631–34.

DWA timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

We review grants of summary judgment by the Claims Court and questions of statutory interpretation de novo. *Wells Fargo & Co. v. United States*, 827 F.3d 1026, 1032 (Fed. Cir. 2016). Thus, the sole question on appeal is whether section 101(d) provides transitional relief for all extraterritorial income received from transactions entered into in 2005 and 2006, including income from such transactions recognized after 2006, or whether the provision is instead limited to extraterritorial income recognized during those years. The Claims Court concluded that section 101(d) limits tax relief to extraterritorial income recognized in those years. We disagree.

## A. Plain Meaning and Statutory Context

"As in any case of statutory construction, our analysis begins with the language of the statute." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (internal quotation marks and citation omitted). "The first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." (citation omitted)). We also "must read the words 'in their

context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, — U.S. —, 135 S. Ct. 2480, 2489 (2015) (quoting *FDA v. Brown & William-son Tobacco Corp.*, 529 U.S. 120, 133 (2000)). This is because statutory "[a]mbiguity is a creature not [just] of definitional possibilities but [also] of statutory context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994).

The plain language of section 101(d) confers decreasing tax benefits for transactions entered into in 2005 and 2006. The provision begins with the straightforward clause, "[i]n the case of transactions during 2005 or 2006," specifying the universe of transactions to which the remainder of the provision shall apply. AJCA § 101(d)(1). The provision then mandates that the "amount includible in gross income" for such transactions "shall not exceed the applicable percentage[s]," as defined by subsection (d)(2). *Id.* Thus, for transactions entered into in 2005, the amount includible in gross income is capped at 20 percent; for transactions entered into in 2006, the amount includible in gross income is capped at 40 percent. Section 101(d) does not reference income earned during the tax years 2005 or 2006. Rather, Congress's use of the word "transactions," which the AJCA's predecessor statute expressly defined to include deals such as "leases" or "rentals" from which income would be received in installments over periods of time, 26 U.S.C. § 943(b)(1)(A) (repealed 2004), strongly suggests that lawmakers intended to provide tax benefits for extraterritorial income derived from transactions entered into in 2005 and 2006, regardless of the calendar or tax year in which that income was earned. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts." (citation omitted)).

Subsection 101(d)(2) is consistent with this reading. The phrase "[i]n the case of transactions during 2005 *or* 2006*" recited in subsection 101(d)(1) describes the cir-

cumstances in which transitional relief is available under the AJCA. AJCA § 101(d)(2) (emphasis added). In subsection 101(d)(2), Congress specified the "applicable percentage[s]" to be used "[f]or purposes of paragraph (1)" in both of those circumstances: "[f]or 2005, the applicable percentage shall be 20 percent," and "[f]or 2006, the applicable percentage shall be 40 percent." AJCA § 101(d)(2). Thus, subsection 101(d)(2) explains how to calculate the treatment of a given transaction by plugging the applicable percentages into subsection 101(d)(1). It does not, as the government suggests, act as a standalone provision that limits the scope of transitional relief available under the AJCA.

The "last antecedent" canon of statutory construction confirms that Congress adopted a transaction-based rule in section 101(d). "The doctrine of the last antecedent is a canon of statutory construction, which states that 'qualifying words, phrases and clauses must be applied to the words or phrases immediately preceding them and are not to be construed as extending to and including others more remote.'" *Demko v. United States*, 216 F.3d 1049, 1053 (Fed. Cir. 2000) (quoting *Wilshire Westwood Assocs. v. Atl. Richfield Corp.*, 881 F.2d 801, 804 (9th Cir. 1989)); *see also Barnhart v. Thomas*, 540 U.S. 20, 21 (2003) (describing "the grammatical 'rule of the last antecedent,' according to which a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows . . ."). In this case, the word immediately preceding the phrase "during 2005 or 2006" is "transactions," not "income." Thus, applying this canon, the statute concerns transactions entered into in 2005 or 2006, not income earned in those years.

The Claims Court's contrary understanding of section 101(d) is erroneous. First, its belief that the phrases "[f]or 2005" and "[f]or 2006" in subsection 101(d)(2) relate "not to 'transactions' but to 'the amount includible in gross income'" for those years because "[o]nly 'income' can be

subject to certain percentages" for a given year, *Dream-works*, 128 Fed. Cl. at 630, places the cart before the horse.  Subsection 101(d)(2) lists applicable percentages "[f]or purposes of paragraph (1)," yet the Claims Court does not grapple with this language.  Instead, it attempts to interpret subsections 101(d)(2)(A) and (B) as standalone provisions, a position that makes no sense when both are *subsections* of the same overall provision— section 101(d).  Second, under both the government and the Claims Court's interpretation, subsection 101(d)(1) would have recited that, "[f]or *income recognized in*" either 2005 or 2006, the applicable percentage would be 20 or 40 percent, respectively.  This is not, however, what the subsection provides.  The government's steadfast effort to read the word "transactions" out of section 101(d) is not enough to justify doing so.  Finally, neither the government nor the Claims Court have cited any case employing the "last antecedent" canon across different subsections as they try to do, and we are aware of none.

Three other provisions in the AJCA—sections 101(c), 101(f), and 102—make clear both that Congress intended to adopt a transaction-based approach in section 101(d), and that it knew how to adopt an income-recognition-based approach when it desired to do so.  Congress, through section 101(c), specified that the repeal would apply only to "transactions after December 31, 2004," meaning that taxpayers were not required to pay taxes on any Qualifying Foreign Trade Income generated by a transaction entered into prior to that date.  The AJCA was enacted on October 22, 2004, meaning that transactions entered into between that date and December 31, 2004, retained the full benefit of the prior ETI regime, regardless of the year in which the income was recognized.  The IRS has adopted this understanding of section 101(c) in several informal agency guidance materials, and the government concedes here that this is the correct reading of section 101(c).  *See, e.g.*, I.R.S. Chief Couns.

Mem. ("CCM") 201,625,011, at 6 (June 17, 2016),
http://www.irs.gov/pub/irs-wd/201625011.pdf ("[I]n the
case of a lease entered into after September 30, 2000, but
before January 1, 2005, that met all the requirements
under the ETI exclusion provisions, all of the income
received from that lease qualifies for ETI exclusions
regardless of when it is received . . . ." (footnote omitted));
CCM        200,813,041        (Dec.        17,        2007),
http://www.irs.gov/pub/irs-wd/0813041.pdf; CCM AM
2007-001 (Jan. 12, 2007), https://www.irs.gov/pub/irs-
utl/am2007001.pdf.

The IRS's continued use of Form 8873, the form on
which taxpayers can claim transitional benefits for extra-
territorial income earned pursuant to transactions en-
tered into before December 2004, underscores that
sections 101(c) and 101(d) are transaction-based provi-
sions.      *See* IRS, Form 8873 (rev. Dec. 2010),
http://www.irs.gov/pub/irs-pdf/f8873.pdf; 81 Fed. Reg.
66,132 (Sept. 26, 2016) (revealing that the IRS, in 2016,
sought and obtained approval from the Office of Manage-
ment and Budget to continue using Form 8873). If, as the
government now argues, transitional benefits are not
available for any tax year after 2006, then Form 8873
would be obsolete. It is not plausible that Congress would
have employed a transaction-based approach in section
101(c) but an income-recognition-based approach in
section 101(d), where the former concerns "transactions
after December 31, 2004" and the latter applies to "trans-
actions during 2005 or 2006."

At oral argument, the government posited that in-
come received from a 2004 transaction would receive the
full benefit of the prior ETI regime under section 101(c),
provided such income was earned prior to December 31,
2004.    *See* Oral Arg. at 17:58–18:08, *available at*
http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20
17-1358.mp3. When asked how it believed income from a
2004 transaction that was received in 2005 should be

treated, the government answered that, under section 101(c), the repeal would be effective for that income, but under section 101(d), there would be limited transitional relief available for that income. *See id.* at 18:09–18:32. The government's understanding runs contrary to the structure of the AJCA, which, as discussed above, places the "applicable percentage" provisions under section 101(d). If the government's theory were sound, the "applicable percentage" provisions would need to be structurally located so as to apply to both sections 101(c) and 101(d)—i.e., they would either need to be standalone provisions that apply to *all* transactions, or similar provisions would need to be located under section 101(c). Neither, of course, is true.

Former section 101(f) likewise employed a transaction-based approach. This provision exempted "any transaction" in the ordinary course of a trade or business that was made pursuant to a binding contract in place on September 17, 2003. There is nothing in the language or structure of this provision that curtailed the duration of pre-repeal benefits for such transactions—in fact, as discussed in greater detail below, it was the lack of any temporal limitation that brought this provision within the European Union's crosshairs.

Finally, section 102, the provision immediately following section 101, contains a new tax benefit applicable to all "domestic production activities." AJCA § 102. Like section 101, section 102 includes a transitional period. *Id.* § 102(a)(2). But, while the extraterritorial income transitional rule in section 101(d) applies in the case of transactions entered into during 2005 or 2006, the transitional provision in section 102(a) provides that, "[i]n the case of any *taxable year* beginning after 2004 and before 2010," the new domestic production activity benefit would be applied using "transition percentage[s]" that the AJCA then set out in a table covering "taxable years beginning in" "2005 or 2006" and "2007, 2008, or 2009." *Id.* Thus,

section 102 reveals that the drafters of the AJCA knew how to craft a transitional rule based on when income was recognized, and that this language is markedly different from the language employed in section 101(d). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Brown*, 513 U.S. at 120 (citation omitted). Indeed, the "'[n]egative implications raised by disparate provisions are strongest' in those instances in which the relevant statutory provisions were 'considered simultaneously when the language raising the implication was inserted.'" *Gomez-Perez v. Potter*, 553 U.S. 474, 486 (2008) (quoting *Lindh v. Murphy*, 521 U.S. 320, 330 (1997)). Such is the case here.

For the foregoing reasons, we conclude that section 101(d) unambiguously provides transitional relief for all extraterritorial income received from *transactions entered into* in 2005 and 2006, even if that income is received in later years.

## B. Legislative History

Because we conclude that the text of section 101(d) is unambiguous, we need not consider its legislative history or subsequent legislative events to discern the meaning or scope of the provision. *See Energy E. Corp. v. United States*, 645 F.3d 1358, 1362 (Fed. Cir. 2011) ("The plain language of the statute here controls and there is no need to seek a contrary legislative intent."). We observe, however, that—contrary to what the Claims Court believed—the legislative history does support DWA's interpretation of section 101(d).

First, the 2004 House Report accompanying the AJCA bolsters the understanding that section 101(d) was meant to afford tax relief for extraterritorial income resulting from transactions entered into in 2005 and 2006. The

report explains that, "[f]or transactions after 2004, the provision provides taxpayers with 80 percent of their otherwise-applicable ETI benefits for *transactions* during 2005 and 60 percent of their otherwise applicable ETI benefits for *transactions* during 2006." H.R. Rep. No. 108-548(I), at 114 (2004) (emphases added). As discussed above, the ETI regime that Congress enacted years before the AJCA employed a broad definition of "transaction" that included not only deals structured as a "sale" from which income would be received as a single payment, but also deals structured as "leases" or "rentals" from which income would be received in installments over periods of time. 26 U.S.C. § 943(b)(1)(A) (repealed 2004). All of the prior tax regimes relating to the taxation of extraterritorial income employed a transaction-based structure. "It is not lightly to be assumed that Congress intended to depart from a long established policy." *United States v. Wilson*, 503 U.S. 329, 336 (1992) (citation omitted).

Second, the fact that Congress repealed section 101(f) in 2006 but chose not to repeal section 101(d) does not, as the government contends, indicate that Congress did not actually intend to create a transaction-based transitional benefit when it enacted the AJCA two years earlier. Had Congress intended to repeal *all* provisions with ongoing tax benefits for domestic producers, it would have had more reason to repeal section 101(c), which provided even greater tax benefits for pre-2005 transactions than section 101(d) did for 2005 and 2006 transactions. Congress, however, left section 101(c) in place. We conclude from the foregoing that Congress's decision to repeal section 101(f) while leaving sections 101(c) and (d) untouched reveals that it was focused on halting benefits for transactions entered into after 2006 (pursuant to binding contracts "in effect on September 17, 2003, and at all times thereafter"), rather than on altering tax rules for transactions that had already occurred. Indeed, one senator remarked that the European Union had indicated that its

real objection to the AJCA was to "the grandfather clause for sales contracts," and that it "was willing to accept the remaining time on the 2-year transition period," and even "the grandfathering of leasing contracts."  152 Cong. Rec. S4440-41 (daily ed. May 11, 2006) (statement of Sen. Baucus).

Finally, we disagree with the government's contention that it is relevant to determining the scope of section 101(d) that Congress enacted both the ETI Act and the AJCA in an effort to comply with WTO rulings indicating that the United States should withdraw prohibited subsidies "without delay."  That argument fails to recognize that section 101(d) would have run afoul of the WTO's interpretation of the United States' treaty obligations under *either* interpretation of the provision espoused by the parties.  *See* J.A. 1940 ¶ 85 (ruling by WTO appellate panel that "the Jobs Act, by virtue of its transition and grandfathering provisions, does not fully withdraw the ETI subsidies found in the previous proceedings to be prohibited").  It is just as likely that Congress intended to quell concerns over the most objectionable provision in the AJCA—section 101(f)—while leaving relief in place for all other transactions.  A congressional desire to avoid disrupting settled expectations for American producers, while still trying to appease its trading partners, is not unheard of; in fact, that balance was struck repeatedly in prior tax regimes regarding extraterritorial income.  In any event, WTO decisions are "not binding on the United States, much less this court."  *Timken Co. v. United States*, 354 F.3d 1334, 1344 (Fed. Cir. 2004).

## III. CONCLUSION

For the foregoing reasons, we reverse the Claims Court's entry of summary judgment in favor of the government and remand for further proceedings.

### REVERSED AND REMANDED

COSTS

Costs to DWA.