Richard F. SPRAGUE, William D. Boham, J. Stanley Gill, James L. McElroy, Jr., John V. Evans, Donald E. Marrs, Gilbert Drucker, John A. McMenamin, Rollie D. Thedford, F. Neil Aschemeyer, David T. Hubbard, William E. Zleit, Denton Gossett, Francis J. O'Byrne, Charles N. Bono, W. Howard O'Bryan, Jr., Paul Harkey, F. Joseph Wieman, Sheldon L. Shepherd, Ralph L. Wampler, Mark W. Haase, Joseph M. May, James L. Garner, Alan L. Jonas, Maxwell Darks and Francis Mayhue, Plaintiffs,

v.

James B. KING, Director of the Office of Personnel Management, Defendant.

No. 92 C 7263.

United States District Court, N.D. Illinois, E.D.

June 23, 1993.

Nicholas Joseph Etten, Jeffrey Charles Blumenthal, Foran & Schultz, Chicago, IL, for plaintiffs.

Jack Donatelli, U.S. Atty's. Office, Chicago, IL, for defendant.

## OPINION AND ORDER

NORGLE, District Judge:

Before the court is defendant James B. King's motion to dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, the motion is granted.

## FACTS

The action before the court is a suit by twenty-six Administrative Law Judges ("ALJs") who adjudicate social security claims within the Department of Health and Human Services. The lawsuit seeks to re-

scind pay classification regulations enacted by the Office of Personnel Management (the "OPM") pursuant to the Federal Employees Pay Comparability Act of 1990 ("FEPCA"), as incorporated in § 529 of Pub.L. 101–509. Specifically, the plaintiffs challenge the OPM's regulations as arbitrary, capricious, unreasonable, and in contravention of the intent of Congress.

The position of ALJ was created by the Administrative Procedure Act (the "APA"), 5 U.S.C. § 701 *et seq.*, to provide an opportunity for a formal hearing on the record before an impartial hearing examiner, thereby ensuring fairness and due process in federal rule-making and enforcement proceedings. The salaries of ALJs are prescribed by the OPM pursuant to 5 U.S.C. § 5372. Prior to the enactment of FEPCA, the statutory language of § 5372 was broad enough to enable the OPM to create pay distinctions between Social Security Administration ("SSA") ALJs and ALJs who served at other agencies. Therefore, before FEPCA became effective, the OPM exercised it discretion under the Classification Act, 5 U.S.C. § 5101 *et. seq.*, which required that the OPM compensate ALJs based on the nature and complexity of their work and the level of responsibility which they were required to exercise.

Prior to the passage of FEPCA, the OPM used the General Schedule to determine the rates of basic pay for ALJs. The General Schedule, which is the pay system for most federal employees, consists of eighteen different "grade" classifications. Various jobs and positions are allocated to the different grades on the basis of the difficulty and responsibility of the work and the required qualifications of the worker. 5 U.S.C. §§ 5102 and 5104. In general, the higher the grade, the higher the salary. Under the General Schedule, SSA ALJs were compensated at the GS–15 pay level, while ALJs of other agencies were compensated under the General Schedule at the GS–15, –16, –17 and –18 pay levels.[1]

1. The exhibits attached to the plaintiffs' and the OPM's memoranda offer several explanations as to the rationale behind the disparity in pay between GS–15 and GS–16 ALJs. According to a letter written by the chair-elect of the American Bar Association's National Conference of Admin-

istrative Law Judges ("NCALJ") to the OPM, the original pay concept was apparently to provide higher pay to ALJs who heard and decided regulatory matters involving business interests; lesser pay was provided to ALJs who addressed social matters of individual citizens. The explanation

The OPM's statutory discretion to establish the salary schedules of ALJs was curtailed by the enactment of FEPCA, which amended § 5372 in several respects. As an initial matter, FEPCA removed ALJ pay from the General Schedule, providing instead three levels of basic pay for ALJs—AL–1, AL–2, and AL–3. The AL–3 level of pay is divided into six graduated rates, and advancement from one rate to the next is determined by the ALJ's length of service. Under FEPCA, the OPM has the responsibility to determine the level in which each ALJ position is placed and the qualifications required for appointment to each level. 5 U.S.C. § 5372(b)(2). Once appointed to the AL–3 level, however, the mechanics of advancement are governed solely by § 5372.

On February 14, 1991, the OPM published interim regulations which it proposed to utilize in the administration of the FEPCA requirements. The OPM published the interim regulations for notice and for the opportunity to consider the views of interested persons. Upon completion of the comment period, the interim regulations were adopted, becoming final on February 13, 1992. *See* 5 C.F.R. § 930.210(j) and (k) (1991).

The conversion regulations adopted by the OPM determined how the pay of incumbent ALJs would be converted from the General Schedule to the six different rates of pay, A through F, within the AL–3 level. The differences in pay between each of the six rates was $5,415 per annum, and therefore, the total difference in pay between rate A and rate F was $27,075. In addition to establishing the amount of pay an incumbent ALJ would receive, the placement of ALJs under the conversions regulations would correspondingly determine how quickly an ALJ would reach the maximum rate of pay.

The OPM used the former General Schedule as the basis for its conversion regulation, and accordingly, the distinctions between

ALJs assigned to the GS–15 level and GS–16 level were incorporated therein. The conversion regulations stated that "under the pay plan conversion schedule, administrative law judges were converted to the new pay system on the basis of their grade and step under the General Schedule on the effective date of the conversion. . . ." As a result of this scheme, all former GS–15 ALJs are being paid 13% to 23% less than former GS–16 ALJs having comparable periods of service. These pay disparities, which amount to $10,800 to $16,200 per year among former GS–15 and GS–16 ALJs having comparable periods of service, will persist for periods of four to seven years, until each former GS–15 ALJ reaches the maximum pay rate of AL–3, rate F. Furthermore, the impact of the OPM's conversion regulation may be felt by former GS–15 ALJs who retire or are disabled prior to reaching rate F, since their pensions will be determined in part by their lower level position at the time of their retirement.

## DISCUSSION

Plaintiffs seek to set aside the OPM conversion regulations as being in violation of the APA because they unjustifiably discriminate against ALJs formerly paid at the GS–15 pay level and fail to eliminate the disparity in pay between former GS–15 and GS–16 ALJs with comparable years of service. The Plaintiffs contend that the legislative history of FEPCA mandates that the sole criterion for establishing the pay level of an incumbent ALJ should be based on their years of service as an ALJ, regardless of their prior compensation level. Because the OPM ignored the alleged congressional intent of FEPCA, the plaintiffs claim the OPM's conversion regulations are arbitrary, capricious, and not in accordance with the law. Accordingly, the plaintiffs ask the court to require the OPM to issue regulations that are consistent with their views and to apply these new

of the NCALJ seems less plausible in comparison to the explanation provided by the OPM Assistant Director for Administrative Law Judges. In response to the NCALJ letter, the Assistant Director stated that although SSA ALJs have unique and important responsibilities, the nature of the cases principally heard by them are generally less complex than those heard by GS–16

ALJs. Specifically, the Assistant Director noted that disability cases are generally not as vigorously contested by experienced legal talent as cases before higher grade ALJs, and that SSA hearings are generally non-adversarial because the SSA is often not represented and claimants often appear without legal representation.

regulations retroactively to February 14, 1991. The OPM has moved to dismiss the complaint for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) and for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6).

■ Lack of subject matter jurisdiction is appropriately raised in a motion to dismiss under Fed.R.Civ.P. 12(b)(1). *Barnhart v. United States,* 884 F.2d 295, 296 (7th Cir. 1989), *cert. denied,* 495 U.S. 957, 110 S.Ct. 2561, 109 L.Ed.2d 743 (1990). Once questioned, it is plaintiff's burden to establish that all jurisdictional requirements have been satisfied. *Kontos v. U.S. Dept. of Labor,* 826 F.2d 573, 576 (7th Cir.1987). In this context, it is proper for the court to look beyond the jurisdictional allegations in the complaint and to view whatever evidence has been submitted in response to the motion. *Roman v. United States Postal Serv.,* 821 F.2d 382, 385 (7th Cir.1987). Furthermore, a complaint will be dismissed for failure to state a claim if the plaintiff can prove no set of facts upon which the sought after legal relief is to be granted. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Ross v. Creighton Univ.,* 957 F.2d 410 (7th Cir.1992).

The OPM argues that § 701(a)(2) of the APA prevents the plaintiff's pursuit of this case by precluding the review of the OPM conversion regulations. The APA presumptively entitles "[a] person suffering legal wrong because of agency action ... to judicial review thereof," 5 U.S.C. § 702, so long as such action is final within the meaning of § 704. In general, an agency's actions are subject to judicial review under the APA if the actions are arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. §§ 701(a), 702. This presumption of reviewability is limited by the threshold provisions of §§ 701(a)(1) and (2), which state that "this chapter applies ... except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1), (2). The OPM does not allege that FEPCA expressly precludes judicial review; the OPM, however, contends

that FEPCA committed the implementation of the FEPCA regulations to its discretion.

■ As to the second exception of § 701(a), the House Report notes that judicial review requires "standards, definitions, or other grants of power [that] deny or require action in given situations or confine an agency within limits as required by the Constitution." S.Doc. No. 248, 79th Cong., 2d Sess. 275 (1946). The absence of such standards and limits exempts agency action from judicial review. *Id.* The Senate Report also addresses the § 701(a)(2) exception:

> [t]he basic exception of matters committed to agency discretion would apply even if not stated at the outset. If, for example, statutes are drawn in such broad terms that in a given case there is no law to apply, courts of course have no statutory question to review.

S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945); *see also Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (citing the Senate Report, the Court found that § 701(a)(2) "is a very narrow exception"). With this legislative history in mind, the Supreme Court has held that § 701(a)(2) precludes review "if a statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). Therefore, to determine whether a meaningful standard of review is available, the court must consider the statutory language, the structure of the statute, the nature of the agency action being challenged, and any relevant legislative history if the statute is ambiguous. *Board of Trustees of Knox County Hosp. v. Sullivan,* 965 F.2d 558, 562 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1043, 122 L.Ed.2d 353 (1993).

■ With regard to statutory language, § 5372 expressly committed the implementation of the FEPCA provisions pertaining to ALJs to the OPM. 5 U.S.C. § 5372(b)(2) ("The [OPM] shall determine ... the level in which each [ALJ] position shall be placed and the qualifications to be required for appointment to each level"). Furthermore, the OPM has the discretion to determine the

**1330**

appropriate circumstances under which ALJs in level AL–3 are to be appointed at an advanced rate. 5 U.S.C. § 5372(b)(3)(B). The only restriction on the OPM's power to prescribe the FEPCA implementing regulation was the requirement that the rate of basic pay for each ALJ, upon conversion to the new pay system, be at least equal to the rate that was payable to that individual immediately before the conversion. *See* § 104(e) of Pub.L. 101–509, 104 Stat. 1447 (1990). Because the statute is facially void of any criteria with which to judge how the OPM is to appoint incumbent ALJs to the new pay system, the statute itself is void of any meaningful standard for reviewing the OPM's implementing regulation. *See Singh v. Moyer,* 867 F.2d 1035, 1038–39 (7th Cir. 1989) (absent governing criteria in statutory language which allowed agency director to recommend waiver of residency requirement there was no meaningful standard for reviewing the agency's action); *Tucker v. United States Department of Commerce,* 958 F.2d 1411, 1417 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 407, 121 L.Ed.2d 332 (1992) (statutory language implementing Constitutional directive to conduct decennial census is so nondirective that there may be no law to apply to case alleging census bureau inaccuracy).

■ In addition to reviewing the statutory language in question, the court is also directed to examine the "nature of the agency action being challenged." *Knox County Hosp.,* 965 F.2d at 562. In certain cases, courts have indirectly applied the "no law to apply" test by finding that the agency action in question is unsuitable for judicial review. *See Heckler v. Chaney,* 470 U.S. at 835, 105 S.Ct. at 1657 (agency decisions that involve a "complicated balancing of a number of factors which are peculiarly within its expertise" merit a presumption of unreviewability). Thus, the § 701(a)(2) exception applies in certain circumstances where courts are unqualified to decide whether an agency has abused its discretion. *Cardoza v. Commodity Futures Trading Com.,* 768 F.2d 1542, 1549 (7th Cir.1985). The types of agency actions which may not be appropriate for judicial review have generally included actions that require extensive fact finding

based on agency expertise, such as actions involving prosecutorial discretion, *Heckler v. Chaney,* 470 U.S. at 834–35, 105 S.Ct. at 1657, national security, *Webster v. Doe,* 486 U.S. 592, 600, 108 S.Ct. 2047, 2052, 100 L.Ed.2d 632 (1988), state department action in foreign affairs, *Cardoza,* 768 F.2d at 1549, and Federal Reserve Board decisions setting interest rates, *id.*

■ The plaintiffs contend that because the enactment of the implementing regulations was not dependent on the specific expertise of the OPM there is a strong presumption of judicial reviewability. As a general matter, the enactment of the FEPCA implementing regulations is not a situation absolutely unsuitable for judicial review. *Cf. American Bank, N.A. v. Clarke,* 933 F.2d 899 (10th Cir.1991) (because the Comptroller must act quickly to close an insolvent bank in order to minimize current and future losses, the Comptroller's assessment of insolvency is a matter committed exclusively to agency discretion); *Local 2855, AFGE (AFL–CIO) v. United States,* 602 F.2d 574, 579 (3d Cir. 1979) (courts are especially inclined to regard as unreviewable aspects of agency decisions that involve "a considerable degree of expertise or experience, or that are based upon economic projections and cost analyses"). Nevertheless, the mere fact that the general nature of the OPM's actions may be reviewable does not advance any discernible guidelines against which its regulations may be measured. Consequently, the court must consider the remaining *Knox County Hosp.* factors to determine whether Congress intended to commit the implementing regulations to the OPM as a matter of law.

■ In their response to the OPM's motion, the plaintiffs focus chiefly on these two remaining *Knox County Hosp.* considerations—statutory structure and legislative history. According to the plaintiffs, both the structure and legislative history of FEPCA indicate a congressional intent from which this court can derive meaningful standards against which to judge the OPM's exercise of discretion. Thus, even absent clear statutory guidelines, the court may deduce a congressional intention to pursue a general goal,

with which the OPM's regulations must be consistent. *See Robbins v. Reagan,* 780 F.2d 37, 45 (D.C.Cir.1985) (if agency action is not reasonably consistent with congressional goal it must be invalidated). The plaintiffs argue that since § 5372 established a new pay system for ALJs; it must be compared with the old system to determine Congress' intent, purpose, and goal in enacting the new law. *See Venetie I.R.A. Council v. Alaska,* 918 F.2d 797, 803 (9th Cir.1990) (congressional purpose and intent "can be gleaned, at least in part, by reference to the prior law").

In arguing that the statutory structure of FEPCA provides a standard to review the OPM's action, the plaintiffs emphasize the distinctions between pre- and post-FEPCA § 5372. As discussed above, under the old General Schedule, the OPM assigned ALJs in various governmental agencies to certain grade levels based on the nature and complexities of the work performed. Under the amended § 5372, a single, six-part pay level was established for all non-supervising ALJs, who advance through the six rates of pay based solely on the ALJ's length of service. Based on the assumption that Congress was knowledgeable about the pre-FEPCA pay provisions, *Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 184–85, 108 S.Ct. 1704, 1712, 100 L.Ed.2d 158 (1988) (Congress presumed knowledgeable about existing law pertinent to the legislation it enacts), plaintiffs assert that the congressional goals of § 5372 were to eliminate the General Schedule as the method of determining ALJ pay, to abrogate the distinctions between GS–15 and GS–16 ALJs, to create a single class of non-supervising ALJs, and to provide a mechanism for advancement predicated solely on an ALJ's length of service.

These goals explain how the OPM is to treat ALJs under the new pay system; they fail, however, to address how the OPM is to convert ALJ pay from the General Schedule to the new levels. Focussing on the elimination of pay distinctions between GS–15 and GS–16 ALJs and the use of length of service as the controlling consideration for pay advancement, the plaintiffs note that the OPM has not explained why it used the General Schedule, as opposed to length of service, as

the basis for its conversion regulations. However, this observation fails to detail how the OPM regulations are inconsistent with the statutory goals embodied in § 5372 that Congress sought to implement. The congressional goals elucidated by the plaintiffs are useful to understand the OPM's current obligations under § 5372; however, they do not provide a meaningful standard against which to judge the OPM's discretionary act of assigning incumbent ALJs to various pay rates within the same level.

Similar to the identification of congressional intent through an analysis of the statutory structure, the legislative history of a statute may produce a congressional objective sufficient to establish a standard against which to judge the OPM's conversion regulations. *Barlow v. Collins,* 397 U.S. 159, 164, 90 S.Ct. 832, 836, 25 L.Ed.2d 192 (1970) (congressional intent is implicit in statutory provisions and their legislative history). As a general matter of statutory review, however, the primary subject of analysis is the language of the statute, and when the terms of the statute are unambiguous, judicial inquiry does not proceed to additional sources except in rare and exceptional circumstances. *See United States v. Albertini,* 472 U.S. 675, 680, 105 S.Ct. 2897, 2902, 86 L.Ed.2d 536 (1985) ("[O]nly the most extraordinary showing of contrary intentions in the legislative history will justify a departure from the language of a statute when that language is plain and unambiguous"); *United States v. Agrillo–Ladlad,* 675 F.2d 905, 908 (7th Cir.), *cert. denied,* 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982). If a statute is facially ambiguous, or if literal compliance with its terms produced absurd or unjust results, reliance on the statute's legislative history is appropriate. *Pullman-standard, Div. of Pullman, Inc. v. Interstate Commerce Com.,* 705 F.2d 875, 879 (7th Cir.1983). Neither of these situations is present, nor even alleged in the instant case. Although facial ambiguity or unjust results are traditionally required prior to review of legislative history, these requisites are unnecessary if the reviewing court is attempting to determine whether Congress intended to permit judicial review of statutorily discretionary agency action. *See Singh v. Moyer,* 867 F.2d 1035,

1038 (7th Cir.1989) (court reviewed legislative history of unambiguous statute to determine no meaningful standards of review existed); *but cf., Knox County Hosp.*, 965 F.2d at 652 (court reviewed legislative history of ambiguous statute to determine existence of meaningful standards of review). Therefore, a survey of FEPCA's legislative history is mandated.

■■■■■ Prior to its enactment, FEPCA went through several incarnations. In 1989, Congress began a series of hearings on comprehensive pay reform for federal employees. Subsequently, several bills, and amendments thereto, were introduced in the House and Senate. As a general matter, "where the final version of a statute deletes language contained in an earlier draft, a court may presume that the earlier draft is inconsistent with ultimate congressional intentions." *In re Town & Country Home Nursing Services, Inc.*, 963 F.2d 1146, 1151 (9th Cir.1992). One of FEPCA's predecessors was a Senate bill, S. 2547 (the "Roth Bill"), introduced on May 1, 1990 by Senator Roth. The Roth Bill provided that the OPM determine, in its sole discretion, the rate of basic pay of each ALJ based on the complexity and variety of cases assigned to the ALJ and the ALJ's length of service. According to the plaintiffs, Congress, by excluding the discretionary provisions of the Roth Bill from FEPCA, demonstrated that length of service, not nature and complexity, was to be the controlling factor in determining rates of ALJ pay.

The Roth Bill, however, was not the sole FEPCA precursor considered by Congress. On February 7, 1990, Representative Ackerman introduced a bill, H.R. 3979 (the "Ackerman Bill"). In the House Committee's official report on the Ackerman Bill, the Committee directed that in implementing the proposed bill, the OPM was expected not to make any distinction between GS–15 and GS–16 ALJs. Like the discretionary provisions of the Roth Bill, the House Committee directive failed to find its way into the final version of FEPCA. Based on the plaintiff's "intent by exclusion" analysis of FEPCA's legislative history, this omission is indicative of Congress' desire to permit the OPM to make distinctions between GS–15 and GS–16

ALJs when implementing the new pay system.

As the above analysis demonstrates, very little can be gleaned from the proposed amendments to § 5372 that were not enacted by Congress. Prior to FEPCA's enactment, various ALJ pay-reform bills were pending in the House and Senate; during the pendency of each of these bills, each body of Congress defined, discarded, reintroduced, amended, and redefined the concepts which ultimately manifested themselves as the current § 5372. The stated purpose of FEPCA was to achieve pay parity between Federal employees and their nonfederal counterparts to alleviate the recruitment and retention problems experienced by Federal agencies. H.R.Rep. No. 906, 101st Cong., 2d Sess., at 87. Additionally, throughout FEPCA's creation, the only congressional intent that is consistently apparent is Congress' desire to create a single class of non-supervisory ALJs, who advance through a six-level pay scheme based solely on the length of their tenure as ALJs. The legislative history is silent regarding the method by which Congress intended the OPM to appoint incumbent ALJs to the FEPCA-amended positions, and nothing within the four corners of FEPCA indicates a congressional intent to provide the same pay rate within level AL–3 to all ALJs formerly compensated at the GS–15 pay level based on the number of years of service as ALJs. Consequently, FEPCA's legislative history is void of any meaningful standard of review on which OPM's actions can be judged.

■■■■ Neither the legislative history of FEPCA, its statutory structure, its statutory language, nor the nature of OPM's actions establish any criteria, guidelines, or standards by which the court can review the OPM's § 5372–implementing regulations. Of course, had the plaintiffs alleged a facial violation of FEPCA's terms, or a violation of the OPM's internal regulation-drafting rules, *Bray v. United States*, 515 F.2d 1383 (1975), the court would have jurisdiction to review such allegations. *Chaney*, 470 U.S. at 832, 105 S.Ct. at 1656 (agency action can always be reviewed to determine whether agency exceeded statutory power). In the instant

case, however, the plaintiffs merely assert that the OPM implementing regulations violated some subliminal and inchoate congressional intent.

Because neither Congress nor the OPM has promulgated substantive guidelines for the OPM to follow when adopting the FEPCA-implementing regulations, there is no law for the court to apply. FEPCA, the governing statute, is so broadly drawn that the court has no standard against which to measure the OPM's exercise of discretion. *See Slyper v. Attorney General*, 827 F.2d 821, 824 (D.C.Cir.1987), *cert. denied*, 485 U.S. 941, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988). Without reasonable precepts by which to judge the OPM's exercise of discretion, review of the OPM's actions would be a mere improvisational assessment of the fairness of the agency's action; Congress has not empowered the court to determine the wisdom of the OPM's decisions in the absence of controlling guidelines. *See Kuhl v. Hampton*, 451 F.2d 340, 342 (8th Cir.1971) ("The federal courts ... were not established to operate the administrative agencies of government").

 Even if the OPM regulations were reviewable under the APA, the OPM asserts that they are not arbitrary, capricious, or contrary to law. In response to the OPM's argument, the plaintiffs claim that the merits of this position cannot be determined absent review of the full administrative record, which includes all documents and materials, including internal agency memoranda, guidelines or hearing transcripts, which were directly or indirectly considered by the OPM's decision makers. As a general rule, if an agency's actions are at all times governed by comprehensive and regulatory provisions that do not vest such action to the agency's discretion, the court must review the entire administrative record to ensure that the agency considered all relevant factors and demonstrated a rational connection between the facts found and the choices made. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416–417, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971); *Lloyd v. Illinois Regional Transportation Authority*, 548 F.Supp. 575, 589–90 (N.D.Ill.1982). FEPCA, however, does not require the OPM to make any adjudication of factual issues prior to its enactment of the conversion regulations; instead, FEPCA simply required the OPM to determine, in accordance with OPM procedures, the appointment of incumbent ALJs to one of the newly-created pay levels. Therefore, if the administrative record explicates a rational basis for the OPM's decision, the record should be sufficient to permit a ruling under § 706 of the APA. Furthermore, a factual record is not necessary to resolve what is largely a legal issue raised by the plaintiffs. *Knox County Hosp.*, 965 F.2d at 564.

 Under § 706 of the APA, the court shall "hold unlawful and set aside agency actions, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review under the arbitrary and capricious standard is narrow, and the judgment of the court cannot be used as a substitute for that of the OPM. *St. James Hosp. v. Heckler*, 760 F.2d 1460, 1465 (7th Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 228 (1985). Although deference is accorded to agency decisions, this deference will not shield an agency's action "from a thorough, probing, in-depth review." *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823.

 In accordance with the arbitrary and capricious standard, the court will uphold agency actions that are "rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Because § 5372 specifically delegated to the OPM the authority to appoint ALJs to the new FEPCA-amended pay system, the only inquiry to be made in the instant case is whether the OPM's decision to base its conversion regulations on ALJs' level of pay under the General Schedule was "rational and consistent with the statute." *Sullivan v. Everhart*, 494 U.S. 83, 87, 110 S.Ct. 960, 963, 108 L.Ed.2d 72 (1990).

 Aside from charging the OPM with the responsibility of appointing incumbent

ALJs to their new positions under the FEP-CA-amended pay system, § 5372 provides little guidance as to how to convert the twenty-five pay levels [2] under the General Schedule to the eight pay rates at three levels under FEPCA. The only restriction placed on the OPM was the requirement that the pay for each ALJ upon conversion be at least equal to the General Schedule rate payable to such ALJ immediately before the conversion.

Prior to adopting the final conversion regulations, the OPM solicited and received comments from eighteen ALJs, one chief ALJ, two members of Congress, and representatives of four ALJ associations. 57 Fed. Reg. 1367 (1992). Out of over 1,110 individual ALJs the OPM received comments from only eighteen, and most of these comments were objections to the single effective date of conversion. · Although there was very little agreement among the commenting ALJs as to how to implement the conversion from the General Schedule to the new administrative law system, none of comments seemed to suggest the OPM use the individual ALJ's length of service as the implementing criterion. The National Conference of Administrative Law Judges ("NCALJ"), however, expressed the concerns espoused by the plaintiffs in the instant case: that Congress, by passing FEPCA, intended to eliminate pay disparity between GS–15 and GS–16 ALJs. Accordingly, the NCALJ recommended that OPM change the interim regulations to provide for conversion of all judges based on years of service. as an ALJ rather than on the basis of their grade and step under the General Schedule.

According to the OPM's response to the interim regulation comments, it attempted to follow congressional intent as much as possible by "establishing a new pay system for administrative law judges that would be fair and equitable to the largest number of judges at the earliest practicable date and still be consistent with FEPCA provisions and long-standing personnel management practices regarding advancement." In ex-

plaining its rationale for adopting the interim conversion regulations without modification, the OPM remarked:

> No one lost money under the conversion plan.... The new schedule ensured that each administrative law judge received a minimum increase of at least [eight] percent above the scheduled rate in effect in 1990.... The final plan converted judges at certain steps of GS–15 and GS–16 to one rate higher than previously allowed. . It was not possible to provide equal pay increases to all administrative law judges.... Some judges of necessity fared better than others as a result of the pay conversion being made effective on the earliest possible date benefitting, overall, the most judges.

57 Fed.Reg. 1368 (1992) (response to comments).

The plaintiffs base their arbitrary and capricious challenge on the allegedly unjustifiable· pay disparity between former GS–15 and GS–16 ALJs. Specifically, plaintiffs contend that they are being paid less than certain other ALJs having comparable years of service and that this disparity contravenes the congressional intent of FEPCA. Nevertheless, salary disparity for toilers in the vineyard does not necessarily equate unfairness and injustice.

The plaintiffs have not lost any money by the conversion regulations—in fact they received a raise in salary. Although the OPM's conversion method did not accomplish instant parity among ALJs having similar lengths of service, complete parity will be accomplished within seven years. In appointing ALJs to the FEPCA-amended pay system, the OPM followed the dictates of Congress. The OPM was expressly directed to implement the switch from one pay system to the other with no additional guidance; the OPM exercised its discretion over this matter in a manner which was fair and equitable to the largest number of ALJs and which was consistent with FEPCA provisions and · long-standing personnel management practices. The OPM considered the important aspects of the con-

---

**2.** Although there are only eighteen "grades" under the General Schedule, the ten "steps" within each grade create 180 different pay levels, twen-ty-five of which were apparently assigned to ALJs.

version scheme and has offered a rational explanation for regulations that it adopted.

That the OPM did not assign rates to ALJs based on their length of service does not require the conclusion that the OPM's regulations are arbitrary, capricious, an abuse of discretion, or not in accordance with law. The plaintiffs have merely failed to benefit from the FEPCA provisions in the manner that they desired. The OPM has demonstrated that it examined the relevant issues, and it has articulated a satisfactory explanation for its conversion regulations. The OPM's regulations are rational and are facially consistent with § 5372. Therefore, even if the court had jurisdiction under the APA to review the OPM's actions, there is no basis under that statute for the court to order the relief requested by the plaintiffs.

## CONCLUSION

For the foregoing reasons, the court grants defendant James B. King's motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.