**Richard F. SPRAGUE, et al., Plaintiffs–Appellants,**

v.

**James B. KING, Director of the Office of Personnel Management, Defendant–Appellee.**

No. 93–2755.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 23, 1994.

Decided April 27, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied July 5, 1994.

Jeffrey C. Blumenthal, Daniel D. Kasten, Foran & Schultz, Nicholas J. Etten (argued), Bell, Boyd & Lloyd, Chicago, IL, for plaintiffs-appellants.

Michael J. Shepard, Asst. U.S. Atty., Crim. Div., Jack Donatelli, Asst. Atty. Gen., Civ. Div., Appellate Section, Chicago, IL, Janet Reno, U.S. Atty. Gen., Mark Stern, Patricia Ann Millett (argued), Dept. of Justice, Civ. Div., Appellate Section, Washington, DC, for defendant-appellee.

Before FLAUM and EASTERBROOK, Circuit Judges, and MILLER, District Judge.*

EASTERBROOK, Circuit Judge.

Most federal administrative law judges serve in the Department of Health and Human Services, resolving claims to federal benefits. Until recently these ALJs began their service at pay level GS–15 and, although they could advance to higher steps of that pay level, could not advance to higher levels. Administrative law judges at most other agencies, such as the FCC or FTC, began service at GS–16. Federal officials who set pay believed this difference in pay appropriate in light of the different tasks involved. An ALJ at the FTC might work on complex mergers, conducting year-long

---

* Hon. Robert L. Miller, Jr., of the Northern District of Indiana, sitting by designation.

trials and writing detailed opinions; an ALJ at HHS would take medical evidence in a brief hearing from oft-unrepresented claimants and write brief, largely formulaic, opinions.

The difference grated on the ALJs at HHS, and they resolved to do something about it. Because a majority of all ALJs work at HHS (780 out of approximately 1,100), they dominate the association of federal ALJs, which asked Congress to eliminate the pay differential. For years nothing happened. But when Congress took up a larger package of proposals concerning pay in the federal service, the ALJs found some sympathetic ears. By the time the shouting was over, the differential was gone—and a lot of other changes had been made to boot. An amendment to the Federal Employees Pay Comparability Act in 1990 removes ALJs from the General Schedule and establishes three grades reserved for ALJs: AL-1, AL-2, and AL-3. 5 U.S.C. § 5372. A new ALJ starts at AL-3, which has six "rates," A through F. As the ALJs acquire experience they progress from Rate A, which pays 65% of the rate of basic pay for Level IV of the Executive Schedule, to Rate F, at 90% of Level IV. Criteria other than longevity play little or no role in advancement. 5 U.S.C. § 5372(b)(3)(A); 5 C.F.R. § 930.-210(d). Grades AL-2 and AL-3, for supervisory ALJs, pay 95% and 100% of the Level IV amount. The new statute not only eliminates the pay differential among ALJs but also substantially increases the maximum pay that ALJs may attain.

Like any other change in the law, this one required a transition provision. How would the existing corps of ALJs be transferred into the new system? The ALJs asked Congress to require the Office of Personnel Management to determine the pay level each incumbent would have attained had the new system been in force for his entire career, and to place him in that grade and rate. Some Members of Congress made statements in support of that approach; OPM opposed it. The text that emerged from the give-and-take of politics provided simply: "In making initial pay adjustments for administrative law judges after [the package of amendments], the rate of basic pay for any such judge shall, upon conversion to the new pay system, be at least equal to the rate which was payable to that individual immediately before such conversion." Section 104(e) of Pub.L. 101-509, 104 Stat. 1447 (1990), reprinted as 5 U.S.C. (1988 ed. Supp. III) § 5372 note. The OPM then issued a regulation placing each ALJ at the lowest grade and rate in the new schedule that exceeded the current pay, yielding this table of conversions:

| General schedule | AL |
| --- | --- |
| GS-15, Steps 1-2-3-4 | AL-3, Rate A |
| GS-15, Steps 5-6 | AL-3, Rate B |
| GS-15, Steps 7-8-9 | AL-3, Rate C |
| GS-15, Step 10 | AL-3, Rate D |
| GS-16, Steps 1-2-3 | AL-3, Rate C |
| GS-16, Steps 4-5-6 | AL-3, Rate D |
| GS-16, Steps 7-8 | AL-3, Rate E |
| GS-16, Step 9 | AL-3, Rate F |
| GS-17, Steps 1-5 | AL-2 |
| GS-18 | AL-1 |

5 C.F.R. § 930.210(k). This transition, which took effect in February 1991, meant that senior ALJs at HHS moved to AL-3, Rate C, the same as spanking new ALJs at the NLRB and most other agencies. Junior ALJs at HHS began at Rate A, and they were doomed to stay behind the ALJs from other agencies until the passage of time brought all to AL-3, Rate F. Persons who started in AL-3, Rate C would reach this plateau in five years; those who began in AL-3, Rate A, would take seven. Thus the OPM's transition rule means that until 1998 some of the ALJs at HHS will receive less pay, holding seniority constant, than ALJs at other agencies. Twenty-six ALJs filed this suit under the Administrative Procedures Act, contending that OPM violated the 1990 amendments, and acted arbitrarily, in devising this transition rule. The district court concluded that the OPM's decision is unreviewable, because committed to agency discretion by law, 5 U.S.C. § 701(a)(2), and dismissed the suit. 825 F.Supp. 1324 (N.D.Ill. 1993).

■ Although it defends the district court's rationale, the OPM also argues that its decision is indeed reviewable, but under the civil service laws rather than the APA. Plaintiffs' argument rests on their belief that

the work of ALJs at HHS is equivalent to the work of ALJs elsewhere—that this proposition is true as a matter of fact, and that Congress recognized as much when it enacted § 5372. According to plaintiffs, this equivalence makes the OPM's transition rule arbitrary. A claim that "[e]qual pay should be provided for work of equal value" is well established in federal law; the phrase we have quoted appears in 5 U.S.C. § 2301(b)(3), part of the Civil Service Reform Act of 1978. Equally well established is the means of vindicating this right: a complaint to the Merit System Protection Board, followed by judicial review in the federal circuit. 5 U.S.C. §§ 1214(c), 7703(b). This is not just an optional system of review; it is the exclusive system. *United States v. Fausto,* 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988).

OPM missed the boat in the district court, neglecting to mention the role of the MSPB and the provisions for review of its decisions. That omission is fatal in light of *Air Courier Conference v. Postal Workers Union,* 498 U.S. 517, 522–23 & n. 3, 111 S.Ct. 913, 917 & n. 3, 112 L.Ed.2d 1125 (1991). There the Court held that another restriction on the scope of review under the APA was not jurisdictional and thus could be forfeited when the agency failed to bring the limitation to judicial attention. Plaintiffs have raised a federal claim, so we have subject-matter jurisdiction under 28 U.S.C. § 1331; and the fact (if it is a fact) that a statute directs claims of this kind to the federal circuit rather than to the district courts and regional courts of appeals, is more in the nature of a venue rule (coupled with an obligation to exhaust administrative remedies) than of a limitation on jurisdiction. As in *Air Courier Conference* the agency waited too long to present its argument. We shall decide this case under the APA—without implying one way or the other whether this is the appropriate route for future cases. *Kamen v. Kemper Financial Services Inc.,* 500 U.S. 90, 100 n. 5, 111 S.Ct. 1711, 1718 n. 5, 114 L.Ed.2d 152 (1991). (Plaintiffs attempt to escape *Fausto* by relying on 5 U.S.C. § 1222, which was enacted in 1989. Whether that statute permits federal employees to obtain review under the APA is a subject we need not consider. See *Gergick v. Austin,* 997 F.2d 1237 (8th Cir.1993); *Rivera v. United States,* 924 F.2d 948, 952–54 (9th Cir.1991).)

■ The OPM insists that there is no law to apply and that the transition decision is therefore committed to its discretion. True enough, the statutory transition rule is sketchy, but it affords *some* law to apply. OPM could not reduce any ALJ's salary; an ALJ who suffered a pay cut during the transition could obtain relief. (Whether under the APA or under the Civil Service Reform Act we need not say—a qualification we shall stop repeating.) Plaintiffs say that the statute creates an additional rule: the OPM must give each ALJ the level and rate he would enjoy today had the new system been put into force years ago. If this is indeed the meaning of the transition statute, then the OPM has deprived plaintiffs of their due; *whether* it is the meaning of the statute is a question of law. Only if we decide it adversely to plaintiffs is there "no law to apply"; but then the conclusion that the selection of a transition rule has been committed to agency discretion will reflect a decision on the merits rather than a conclusion that the subject is not reviewable. "No law to apply" is shorthand for a conclusion that Congress has given the agency discretion without creating benchmarks by which a court may assess its exercise. *Lincoln v. Vigil,* —— U.S. ——, —————, 113 S.Ct. 2024, 2030–31, 124 L.Ed.2d 101 (1993); *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). Incantation of the phrase does not permit a court to leap over the legal question: How much discretion does the agency possess? See Cass R. Sunstein, *Reviewing Agency Inaction After Heckler v. Chaney,* 52 U.Chi.L.Rev. 653 (1985).

Congress told the OPM to establish a transition rule. It established only one restriction: no one could come out of the move with a lower salary. Nothing in § 5372 itself implies any greater limit on the scope of permissible choice. Section 5372 does not say that all ALJs shall be paid strictly according to seniority. It establishes a system of progression by longevity, § 5372(b)(3)(A), but this rule applies only "[u]pon appointment" to an AL–3 position. Indeed, nothing in § 5372 would stop the OPM from continu-

ing the practice of starting the ALJs in HHS at lower salaries than the ALJs in other agencies. Section 5372(b)(3)(B) provides that "[t]he Office of Personnel Management may provide for appointment of an administrative law judge in AL–3 at an advanced rate under such circumstances as the Office may determine appropriate." So if the OPM were to decide that it is "appropriate" to appoint beginning ALJs at the SEC to AL–3, Rate D, and beginning ALJs at HHS to AL–3, Rate A, nothing in the statute would bar the door. Market forces could make such a decision look very attractive. The SEC wants lawyers with securities experience, and such persons have higher-paying opportunities in the private sector. After seven years on the job all ALJs in every agency would reach AL–3, Rate F; Congress thus determined that the *terminal* salaries of ALJs should not vary by agency; but the fixing of *initial* salaries has been left to the OPM. (The OPM's current regulations do not distinguish by agency for new appointments; our point is not that the OPM has made a decision that such a difference is "appropriate" but that Congress left it the discretion to do so.)

What plaintiffs offer in response is legislative history. A description of the kind of material on which plaintiffs rely is enough to show its irrelevance. They offer not committee reports and other explanations of the text Congress enacted, but statements on the floor (and in committee meetings) by individual Members of the House supporting proposals and amendments that were not enacted. We see no need to digest this thin gruel. The statutory text is plain enough as is. It may be that the statements to which the ALJs point show that several powerful members of Congress very much wanted the OPM to act differently, but wishes are neither fishes nor laws. "Congress may always circumscribe agency discretion ... by putting restrictions in the operative statutes (though not, as we have seen, just in the legislative history).... And, of course, we hardly need to note that an agency's decision to ignore congressional expectations may expose it to grave political consequences." *Lincoln*, —— U.S. at ——, 113 S.Ct. at 2032. But those consequences are delivered through the political process. "[T]he remedy for noncompliance with the admonition is in the hands of the body that issued it." *American Hospital Association v. NLRB*, 499 U.S. 606, 617, 111 S.Ct. 1539, 1545–46, 113 L.Ed.2d 675 (1991).

■ As for the plaintiffs' submission that the conversion rule is "arbitrary" because based on the "discredited" distinction between the ALJs at HHS and those elsewhere: § 5372 does not "discredit" the old rule but establishes a new one for the future. It is not arbitrary to make haste slowly. Retarding implementation of the higher levels of pay saves the public money, and it is hard to fault federal managers for excessive devotion to taxpayers' interests. Everyone got a raise; how much of a raise, how fast, is a managerial rather than judicial decision. Cf. Antonin Scalia, *The ALJ Fiasco—A Reprise*, 47 U.Chi.L.Rev. 57, 62–80 (1979). Whether a longer period of transition serves the public interest is precisely the kind of question that *is* committed to the OPM's discretion. There is no one right or just wage, and it was not "arbitrary" for the OPM to conclude that ALJs who had been willing to work for GS–15 wages must settle for an immediate raise and the prospect of an escalator to a much higher salary.

AFFIRMED.

FLAUM, Circuit Judge, concurring.

Judge Easterbrook has written an authoritative opinion that I join. I write separately not to address any deficiencies in the foregoing legal analysis—indeed, to my mind, there are none. Rather, I write simply to underscore a point that may appear understated in light of the framing of the issue presented here and the inexorable result we reached. As the linchpin of a vast network of agency decisionmaking, the oft-times heavily burdened and undervalued administrative law judiciary assumes duties and responsibilities that are functionally comparable to those of Article III judges. *See Butz v. Economou*, 438 U.S. 478, 513–514, 98 S.Ct. 2894, 2914–2915, 57 L.Ed.2d 895 (1978); *Ramspeck v. Federal Trial Examiners Conference*, 345 U.S. 128, 73 S.Ct. 570, 97 L.Ed. 872 (1953). As the opinion points out, *ante* at 187, plain-

**190**

tiffs argument here rests on their belief that the work of ALJs at HHS is equivalent to work of ALJs elsewhere. Of course, it is not our role to resolve this question as an empirical matter and our decision today in no way should be read as doing so.